Filed 3/5/14  In re Jadyn L.  CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re JADYN L., a Person Coming Under the Juvenile Court Law. | B249181 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>HEATHER M. et al.,<br><br>        Defendants and Appellants. | (Los Angeles County Super. Ct. No. CK94442) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Valerie Skeba, Juvenile Court Referee.  Affirmed.

———

Marsha F. Levine, under appointment by the Court of Appeal, for Defendant and Appellant Heather M.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant Curt L.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

———

Heather M. (Mother) and Curt L. (Father) appeal from the judgment entered after the juvenile court declared their son, born in April 2008, a dependent of the court under Welfare and Institutions Code section 300, subdivision (b)[1], and made dispositional findings. Mother and Father contend that substantial evidence does not support the jurisdictional determinations and that the juvenile court erred by removing the child from their custody. We disagree and thus affirm the order.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *The Events Leading to the Section 300 Petition*

On November 21, 2012, the child's maternal grandmother contacted the Department of Children and Family Services (DCFS), reporting "that there is [an] ongoing domestic violence relationship between [the] parents. There's a lot of yelling, screaming and name calling by father on the mother in the presence of the child. The situation escalated to a point that the mother and her son . . . left 2 weeks ago and temporarily moved in with [the maternal grandmother]. [¶] [On the] morning [of the call to DCFS], father came to visit and told the mother that he is bringing the child to Universal Studios. However, as soon as he picked up the child, he called and told the mother that she cannot have the child back and she needs[] [t]o get a Court order to have him back. [¶] [The maternal grandmother] described the father as 'unstable' and 'crazy' but never been diagnosed and . . . did not elaborate. [She] indicated that the father is putting the child in the middle of the parent[s'] conflict."

Later that day, a social worker visited Father and his son at Father's mobile home. Father said he and Mother had lived together for about 10 years. A few weeks earlier, on November 4, Mother left the home, without telling Father why, and did not take the child, then four years old, with her. Father denied any verbal or physical altercation between himself and Mother when Mother left the home. The following day, Father took the child to the maternal grandmother's house, where Mother was staying, and left him there.

---

[1]     Statutory references are to the Welfare and Institutions Code.

Father denied any abuse or neglect of the child, as well as domestic violence between himself and Mother. Father "did admit that he had a drug history of abusing methamphetamine and speed. He claimed he has been out of jail more than a year and is not on parole or probation. He claimed he does not drink alcohol or use illicit drugs because if he did he would 'die[.][']  He denied current drug use. . . . [¶] The father claimed he had surgery in April of [2012] for a brain aneurysm and has a genetic liver condition and drinking or using drugs would have an adverse impact on his health. . . . [¶] . . . [Father said] both [he and Mother] were using methamphetamine and marijuana, but the father claimed they have never used illicit drugs in the presence of the child . . . . The father stated that he and the mother would routinely use methamphetamine together. He stated he last used with the mother in June 2012. [¶] The father claimed that when the mother was living with him she would leave [the child] with him frequently while she would go out with other men in the mobile home park. The father claimed he believes the mother smokes 'pot[,][' ] but the mother has never smoked around [the child]."

The social worker also interviewed the maternal grandmother, who "stated the mother was living with her for the past few weeks because [the mother] was not getting along with the father. She stated she has never known the father and the mother to physically fight, but she believes there is a lot of arguing between them in the presence of the child . . . . [¶] She also stated she is aware the father has a drug history and is aware that the mother has a drug history, but has never seen the parents use illicit drugs." The maternal grandmother "suspects the mother is using illicit drugs given her recent behavior as the mother has a long history of drug use and the maternal grandmother has learned to recognize the signs." The maternal grandmother informed the social worker that she has a legal guardianship over the mother's two other children, then ages 16 and 18, half siblings of the child. "[I]n the year 2000 mother was residing with [the maternal grandmother] . . . along with [those two children] and the mother was neglecting the needs of the children so she told mother to move out and she kept the children. Mother never appeared in court so [the maternal grandmother] was granted

3

legal guardianship. . . . DCFS was never involved with the half[-]siblings and their father is deceased."

On November 27, Father tested positive for marijuana. On that same day, the maternal grandmother informed the social worker that Mother had been incarcerated on November 25 for outstanding bench warrants.

Father, the maternal grandmother and the maternal aunt attended a team decision making meeting on November 29. Mother did not attend, as she still was incarcerated. Father "admitted to a forty[-]year history of illicit drug use and that during his time with the mother he and the mother abused methamphetamine and marijuana." Father refused to consent to a detention of the child and left the meeting without the child, who remained with the maternal grandmother.

Mother contacted the social worker on December 4. Mother was arrested for three outstanding bench warrants, one for riding public transportation without a ticket, one for smoking in a non-smoking zone and one for an arrest several years prior for possession of methamphetamine and failure to show proof of completion of a drug counseling program. Mother had a court date on December 18 to provide the proof of completion. Mother "stated she does have a methamphetamine history . . . [that] goes back about ten years. She stated she stopped using methamphetamine when she was pregnant with her son . . . . She stated she also has used marijuana, but has not used marijuana for about two or three months. She stated she has never used marijuana in the presence of [the child]." Mother denied domestic violence in her relationship with Father. Mother did not complete her interview with the social worker, as she ended her call with the social worker and failed to call back as promised.

Later that day, DCFS obtained a removal order for the child because "DCFS could not ensure the safety of the child . . . under the care of the parents due [in part] to . . . the parents['] history of methamphetamine and marijuana use and the father's positive test for marijuana on 11/27/12." The child was detained and placed with his maternal aunt. A search was initiated on December 5 to locate Mother.

4

2.      *The Section 300 Petition and the Detention Hearing*

On December 7, DCFS filed a petition under section 300, subdivision (b).  As to Mother, the petition alleged, "The child['s] . . . mother . . . has a ten[-]year history of illicit drug abuse, and is a current abuser of methamphetamine and marijuana, which renders the mother unable to provide regular care and supervision of the child.  On prior occasions, the mother was under the influence of illicit drugs while the child was in the mother's care and supervision."  As to Father, the petition alleged, "The child['s] . . . father . . . has a forty[-]year history of illicit drug abuse, and is a current abuser of methamphetamine and marijuana, which renders the father unable to provide regular care and supervision of the child.  On 11/27/2012, the father had a positive toxicology screen for marijuana.  On prior occasions, the father was under the influence of illicit drugs while the child was in the father's care and supervision."

At the detention hearing, also on December 7, at which both Mother and Father appeared, the juvenile court found a prima facie case for detaining the child, no reasonable means to protect the child without removal and reasonable efforts to prevent or eliminate the need for removal.  The court continued the child's placement with the maternal aunt.  It granted Mother and Father monitored visitation and family reunification services and ordered them to submit to random and on-demand drug testing.

3.      *Jurisdiction and Disposition*

In the jurisdiction and disposition report, filed on January 10, 2013, DCFS stated that despite its attempts to locate Mother it had been unable to interview her.  Father refused to be interviewed without his attorney present.  DCFS reported possession of a controlled substance for Mother in 2007 and several convictions for Father in 2008, two for possession of a controlled substance and one for burglary.

According to the maternal aunt, Mother "'has a long history of using drugs on and off.  She will clean up for a while and then go back to the drugs.  She did rehab a few years ago and she did really well after she got out; but she eventually slipped back into it.  As far as [the maternal aunt] know[s], [Mother] just uses pot and meth.  She won't even talk to [the maternal aunt] since all of this happened because she blames everyone for

5

what is going on. [The child] hasn't mentioned anything about [his parents'] drug use since he has been [with the maternal aunt]. [Mother's] behavior now is like it was when she was using drugs in the past. When . . . at Court, she was mentally unstable and her behavior was really odd. [The maternal aunt does not] think [the child has] been abused by [his parents], . . . just . . . seen and been exposed to a lot of stuff that he shouldn't have.'" As for Father, the maternal aunt reported, "'I know [Father] has a long drug history as well. I know he smokes pot and he has done meth with [Mother]."

The maternal grandmother reported that, when Mother was staying with her in the weeks before the DCFS referral, Mother "'would be up for two to three days at a time and then sleep for three to four days. [The maternal grandmother does not] know if [Mother] is using meth again because [she] didn't see any sores on [Mother's] face like last time; but, [she has not] seen [Mother] since Court. [Mother] has been blaming all of this on [the maternal grandmother], of course. [The maternal grandmother] know[s] [Mother] used meth before and smokes pot but [does not] know if she is still smoking pot. As a mother, you don't want to see the signs but [she] ha[s] been looking and [she] [doesn't] know if [Mother] is using again. When [Mother] was [staying with the maternal grandmother] she was yelling and cur[s]ing at [the child] and [the maternal grandmother] was very upset about that.'" The maternal grandmother said, "'I know [Father] smokes pot and I think [Mother and Father] used meth together. There was one time last summer that I caught him in my garage smoking pot and I told them that they had to leave. I heard that he has a prescription for the pot because of his brain aneurism but I don't know how true that is.'"

DCFS reported that a dental examination on December 19 revealed that the child had seven untreated cavities. During a physical examination on January 14, vaccines were administered, as the child "has not had routine health care and he was behind in some immunizations. Maternal aunt reported his last immunization records show his last appointment was on 10/09/2009[,]" more than three years ago. On January 3, the maternal aunt reported that Mother had called three times since the December 7 court date but had not visited the child and that Father had visited once and called every day.

After the juvenile court ordered DCFS to interview Father, DCFS filed a supplemental report, dated March 19, indicating that it made numerous attempts to reach Father but had been unsuccessful and learned from Father's attorney that Father had not responded to calls from his attorney. DCFS's last contact with Father was January 2 when Father refused to be interviewed without his attorney present. DCFS had not spoken to Mother since December 4 despite numerous attempts to reach her as well. Mother too did not respond to calls from her attorney. Although the social worker reached Father on March 18, he refused to speak to the social worker without his attorney present. Neither parent submitted to drug testing. The maternal aunt reported that recently Mother and Father called the child once a week, now together, but had not visited him.

In a further supplemental report, filed on April 8, DCFS reported that Mother had stated that she stopped using methamphetamine, around 2007, before she became pregnant with the child. Mother said she had been arrested for possession of methamphetamine before the child was born and ordered to complete a drug program in 2009 or 2010. She stated, "'When I was using, I used once a month or twice a month. I don't know how much I would use. I would usually snort one line. For a while there, it got to be a lot; well, not a lot, maybe three lines a month off and on for five or six years. It wasn't consistent; it was an off and on thing but all before I was pregnant with [the child]. I don't know why the father said that we would use meth routinely together and last used in June 2012; that's not true. [¶] I last used marijuana in September or October 2012. I would smoke at my friend['s] . . . house. . . . I never smoked in our home. I'm not sure where [the child] was when I was smoking; maybe with my mom or his father. I have never done any other drugs. I obtained my marijuana license a couple of months ago because I have a really bad back problem. I got the license but I don't use it. I haven't tried or used any other drugs in the last six months.'" Father stated, Mother "'hasn't got[ten] high on methamphetamine since the kid was born. She would use methamphetamine once a month to my knowledge. Occasionally, maybe, she smoked marijuana but I'm not sure on that. I don't know even the last time she used marijuana.

7

We last used meth together over five years ago.  We smoked marijuana years ago together.  I didn't know that she was smoking marijuana around September or October 2012.'"

As to Father, Mother stated he used methamphetamine on occasion as she did, but quit before she became pregnant with the child.  Father "'does have a marijuana license because he has two brain aneurisms, [chronic obstructive pulmonary disorder], and hemochromatosis.'"  Father said that he "'started using meth when [he] was 18 years old and [he] went into the service.  [He] smoke[s] marijuana but . . . [has not] smoked pot for a couple of weeks.  [He] last used meth almost five years ago.  When [he] was using, [he] would use meth once every four or five months over the last forty years.  [He has] use[d] marijuana once in [a] while over the last couple of years.'"

DCFS indicated that on March 19 the parents were spoken to regarding visitation, drug testing and referrals.  The social worker offered to come to their home to provide them with bus passes, drug testing, referrals, visitation schedules and case plan referrals.  The parents declined until they could speak to their attorneys.  Father stated he lacked the ability to come to the DCFS office to obtain the referrals.  Mother and Father both indicated they would contact their attorneys for approval for the social worker to come to the home and call the social worker back, but neither got in touch again with the social worker.  DCFS arranged a visitation schedule and mailed it to the parents.

At the adjudication hearing on April 29, the juvenile court, after considering the reports and exhibits and hearing testimony from Mother, concluded that "when this case came in [DCFS] had some legitimate concerns about drug use by the parents.  Father has a very, very lengthy criminal background, including a conviction . . . where he was sent to state prison. . . . It includes possession of a controlled substance.  And he got sent to state prison for a couple of years.  Mother also has some criminal history involving drugs. . . . I think [DCFS] has some legitimate concerns about parents' lengthy substance abuse histories, both of them.  Father's more so than mother's. . . . I ordered the parents to randomly drug-test on [December 7, the day the petition was filed].  So mother's statements that she doesn't know that she was supposed to drug-test, I just don't find very

8

believable. With respect to grandmother's statements, I think she was being very honest. I do think she had some legitimate concerns. The behaviors that she described, the staying up for days at a time, and then sleeping for days at a time is very indicative of substance abuse. I don't find mother's statements that she was just depressed because of the issues with the father to be very persuasive. And it appears that grandmother has seen this behavior over the years a number of times."

The juvenile court further determined, "With respect to the statements by parents' counsel that there's really no nexus, I would disagree with that. Mother testified that the last time she saw a doctor for [the child] was two years ago. Actually, . . . it's more like three, and that he was behind with his . . . immunizations. Mother said that the last time the child saw a dentist was a year and a half ago. The child had seven cavities. This child is only four years old. That's pretty bad. Somebody is neglecting that child. And since mother says that he was in her custody the entire time, and it seems like father was partially involved in taking care of the child, you know, that's really the parents' neglect. So I think that parents' drug use did affect the child. . . . [U]nder no circumstances should a four-year-old have seven cavities. And the lack of seeing a doctor is very concerning, because children of this age need to be seen by a physician on a regular basis. As well as a dentist. And it does appear that he has some speech delays[,] which need to be worked on. So I do think the parents have a substance abuse history."

As to drug testing and visitation, the juvenile court found, "And the fact that [the parents] basically refuse to test, I can't draw a positive inference from that. You know, the case has been here quite a while now. . . . Over four months. And the fact that the parents haven't tested at all, not once, is pretty concerning. If you add on top of that the limitation in visitation—I think one of them visited one time. I think it was father. Mother hasn't visited at all. That is also very concerning, because these are all types of behaviors you see from people who are—have a substance abuse issue and are attempting to hide it. And father, who cannot get to drug testing here in Lancaster, is able to get down to Tujunga and get a medical marijuana card. Now, I always have concerns when people get a medical marijuana card after the case has been filed. I would question

9

whether this doctor knows much about father's history. . . . So I didn't find the mother's testimony to be very persuasive at all. I do think [DCFS] has tried to give [the parents] referrals, [it has] tried to provide services, and the parents have just refused. They did have the ability to test without the transportation issues for the first couple of months of the case after I had ordered them to test on December 7th. They didn't test then. Now they've moved to a place where testing will be difficult. But they had the ability earlier, and they didn't do it then either."

Based on these conclusions, the juvenile court declared the child a dependent of the court under section 300, subdivision (b), found removal from his parents' care appropriate and continued his placement with the maternal aunt. The court amended the language in the section 300, subdivision (b), allegation as to Mother and as to Father to eliminate the words "a current abuser" and focus on the "history of illicit drug abuse," adding the words "including use" of methamphetamine and marijuana. It ordered an on-demand test for the parents that day, as well as substance abuse counseling, with random and on-demand drug testing, and "parenting and individual counseling to address substance abuse issues and relationship issues." It also ordered the parents to allow the social worker to come to their home to help them in obtaining services and determining where to drug test.

Mother and Father each filed a timely notice of appeal. (§ 395, subd. (a)(1); see *In re Tracy Z.* (1987) 195 Cal.App.3d 107, 112 [jurisdictional findings reviewable on appeal from the judgment following disposition].)

## DISCUSSION

Mother and Father contend that the evidence is insufficient to support the jurisdictional findings under section 300, subdivision (b), and that, in any case, the juvenile court should not have removed the child from their care. We disagree.

"The purpose of section 300 is 'to identify those children over whom the juvenile court may exercise its jurisdiction and adjudge dependents.' [Citation.]" (*In re A.O.* (2010) 185 Cal.App.4th 103, 110.) To declare a child a dependent under section 300, the juvenile court must find by a preponderance of the evidence that the allegations are true.

10

(*In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1318; see § 355, subd. (a).) We review the court's findings under section 300 for substantial evidence and will affirm the judgment based on those findings if they are supported by reasonable, credible evidence of solid value. (*Matthew S.*, at p. 1319.)

Under section 300, subdivision (b), the juvenile court may adjudge a child a dependent of the court when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child . . . ." "A jurisdictional finding under section 300, subdivision (b)[,] requires: '"(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the child, or a 'substantial risk' of such harm or illness." [Citation.]' [Citations.]" (*In re James R.* (2009) 176 Cal.App.4th 129, 135.) When the jurisdictional finding is "based on the parent's 'inability . . . to adequately supervise or protect the child[]'" DCFS must show "parental unfitness or neglectful conduct." (*In re Precious D.* (2010) 189 Cal.App.4th 1251, 1254.)

As relevant, the sustained section 300, subdivision (b), allegation against Mother provided that Mother "has a ten[-]year history of illicit drug abuse, including use of methamphetamine and marijuana, which renders the mother unable to provide regular care and supervision of the child." Substantial evidence supports the sustained allegation. As of the adjudication hearing on April 29, 2013, Mother had not drug tested once since being ordered to do so on December 7, 2012, and she had not visited the child at all. She admitted a lengthy history of drug use, but said that she had stopped using methamphetamine before becoming pregnant with the child. Both the maternal grandmother and maternal aunt, however, recognized signs of drug use in her. In particular, when Mother stayed with the maternal grandmother just before inception of the dependency proceedings, she stayed awake for several days and then slept for several days. In addition, Father reported on one occasion that he and Mother had used methamphetamine in June 2012, but later indicated, as Mother had, that they had not used the drug after Mother became pregnant with the child. Mother admitted to marijuana use

11

in September and October 2012. Mother did not provide the child with regular medical care, causing him to be behind on his immunizations, as the child did not see a doctor for routine care from the time he was one year old until he was four years old and under the care of maternal aunt. Mother also did not provide the child with regular dental care. He had seven untreated cavities at the age of four years. DCFS was unable to locate Mother at certain times, Mother refused to allow the social worker to come to her home and Mother did not maintain regular contact with DCFS or her attorney. During the dependency proceedings, she was incarcerated for a short period of time, in part because she had failed to submit proof of completion of a substance abuse program ordered based on a drug possession charge. Mother did not obtain such proof during the dependency proceedings.

As relevant to Father, the sustained allegation under section 300, subdivision (b), provided that Father "has a forty[-]year history of illicit drug abuse, including use of methamphetamine and marijuana, which renders the father unable to provide regular care and supervision of the child. On 11/27/2012, the father had a positive toxicology screen for marijuana." Substantial evidence supports this allegation as well. Father admitted to 40 years of using drugs. Although he later changed the dates, he initially acknowledged using methamphetamine as late as June 2012. He tested positive for marijuana in November 2012, just after DCFS became involved with the child, and then never tested again during the dependency proceedings. He said he would die if he used illicit drugs because of his health issues, but was using methamphetamine and marijuana regardless and obtained a medical marijuana card. He has two convictions for possession of a controlled substance, as well as a burglary conviction, and was previously incarcerated. He called the child regularly, but visited him only once during the dependency proceedings. Father also failed to ensure that the child received regular, routine medical and dental care when the child was in his custody. Like Mother, Father refused to allow the social worker to come to his home to provide referrals and failed to maintain regular contact with DCFS or his attorney.

12

Mother's and Father's argument that, even if jurisdiction were proper, the juvenile court should not have removed the child from their custody pursuant to section 361, subdivision (c)(1), also fails.[2]  As noted, Mother and Father were using drugs in the months before inception of the dependency proceedings and never tested once after DCFS had initiated the proceedings.  They both admitted lengthy drug histories.  They failed to visit their son, with Father visiting only once and Mother not visiting at all.  They did not provide the child with regular, routine medical and dental care when he was in their custody.  Under these circumstances, substantial evidence supports the court's removal decision under section 361, subdivision (c)(1).  (*In re Henry V.* (2004) 119 Cal.App.4th 522, 529 [review standard for removal decision under § 361, subd. (c)(1), is substantial evidence].)[3]

---

[2]     Section 361, subdivision (c)(1), provides that a juvenile court can order removal of a dependent child from his or her parent's physical custody upon clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody."

[3]     Father also contends that the juvenile court's modification of the allegation against him in sustaining the petition demonstrates that the court failed to "maintain impartiality" and denied him the right to a "full and fair hearing."  We disagree.  The allegation as pleaded against Father incorporated two concepts, first that Father had a 40-year history of illicit drug abuse and second that Father was a current abuser of methamphetamine and marijuana, both of which rendered him unable to provide regular care and supervision of the child.  In modifying the allegation, the court merely struck the words "and is a current abuser," deciding not to sustain the allegation on that basis and inserted the words "including use" so that the allegation read coherently to provide that Father's history of illicit drug abuse, including use of methamphetamine and marijuana, rendered him unable to provide regular care and supervision of the child.  Such modification did not alter the concept of a history of illicit drug abuse alleged against Father in the petition.

13

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED</u>.


ROTHSCHILD, Acting P. J.

We concur:


CHANEY, J.


MILLER, J.[*]

---

[*]     Judge of the Los Angeles Superior Court, Assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.