189 Cal.App.4th 1251 (2010)
117 Cal. Rptr. 3d 527
In re PRECIOUS D., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent,
v.
PATRICIA D., Defendant and Appellant.
No. B221929.
Court of Appeals of California, Second District, Division One.
November 8, 2010.
*1253 John Cahill, under appointment by the Court of Appeal, for Defendant and Appellant.
Andrea Sheridan Ordin, County Counsel, James M. Owens, Assistant County Counsel, and O. Raquel Ramirez, Deputy County Counsel, for Plaintiff and Respondent.

OPINION
MALLANO, P. J.
The juvenile court asserted dependency jurisdiction over an incorrigible teenager, 17-year-old Precious D., under Welfare and Institutions Code section 300, subdivision (b), and removed her from the custody of her mother, Patricia D. (Mother).[1]
(1) In this case of first impression, we address the issue of whether the provision of section 300(b) providing for jurisdiction based on the parent's "inability ... to adequately supervise or protect the child" requires that the parent be unfit or neglectful in causing serious physical harm to the child or a *1254 risk of such harm. We hold that, in light of the dependency statutory scheme and federal due process principles, parental unfitness or neglectful conduct must be shown in order to assert dependency court jurisdiction under that part of section 300(b) providing for jurisdiction based on the parent's "inability... to adequately supervise or protect the child." Because there was insufficient evidence of both unfitness and neglectful conduct in this case, we reverse the jurisdiction and disposition orders.

BACKGROUND
Precious D., born in August 1992, lived with Mother and Precious's two half sisters, ages 14 and 8. Mother's male companion, Onajite E. (Stepfather), was the father of Precious's half sisters and visited their home often, but did not live there. Precious's father, Steven B., lived in Arizona, last visited with Precious in 2002, and did not appear in these proceedings. When Precious was 16 years old, she started associating with the "wrong crowd," talked to "older guys" on the phone, met up with people she met on the phone, misbehaved, missed classes, and started running away from home. Mother suspected that Precious was engaging in prostitution, but Precious denied it.
In March 2009, the Los Angeles County Department of Children and Family Services (DCFS) received a referral from the Los Angeles Police Department that Precious was a runaway and that she was picked up by the police in Long Beach. Precious asserted that Stepfather beat her; she refused to return home to Mother. A police detective told DCFS that there was no evidence of abuse, and DCFS concluded that the allegations of physical abuse were unfounded.
Although Precious consistently maintained that Stepfather physically abused her by hitting her with an extension cord, Precious was unable to provide specific dates, times, instances, or motives for such physical punishment. Mother denied ever physically abusing Precious and told DCFS that she was willing and able to protect Precious from any abuse and wanted Precious to return home, but Mother needed support to help her address Precious's mental health needs. Stepfather was hurt and shocked by Precious's allegations of abuse; he denied ever hitting Precious or her half sisters. He told DCFS that they had been trying everything to help Precious, and when she ran away, they would look day and night to find her. Precious's half sisters also denied any abuse in the home. Precious "remains adamant that she is not afraid of [Mother]," but it was unclear to DCFS why Precious ran away from home and did not want to return to Mother.
*1255 On March 12, 2009, Mother signed a voluntary family reunification contract and Precious was placed in a foster home. The next day, Precious ran away from the foster home. Precious's foster mother reported that Precious was sneaking boys into the home and that she had taken Precious to the emergency room because she had contracted a sexually transmitted disease, chlamydia. According to Precious, she received medication for a bladder infection.
In April 2009, Precious was placed in a second foster home, where she was disrespectful, left without permission, refused to follow the house rules, skipped classes, and sent threatening and inappropriate messages to her family. Mother and Precious spoke by telephone daily, but Precious refused to see Mother or her half sisters. In April 2009, Precious told a DCFS social worker that she had a boyfriend who was 20 years old. Precious also persisted in her claim that she had been the victim of a gang rape, even though Mother had taken her to the hospital and a rape examination revealed no trauma.
After a month in the second foster home, Precious's foster mother reported that Precious was engaging in behaviors such as missing classes in school, running away, stealing, and leaving home to "hang out with boys." The foster mother told DCFS that Precious "craves attention and dresses very provocative[ly]." Although the foster mother had requested that Precious be placed in another home, the foster mother agreed to continue with Precious's placement to allow her to receive mental health services.
In June 2009, the foster family agency reported that Precious was enrolled in mental health counseling but was not on any medication and had not begun family therapy. Mother continued to telephone Precious daily, but because of transportation problems had not visited with her; the foster family agency then agreed to transport Mother for visits with Precious. Precious's foster mother reported that the mental health counseling did not seem to be making an impact on Precious's behavior, as Precious refused to do any chores, missed classes every day, and "all [she] wants to do is run away and fight." Mother telephoned Precious often, but Precious refused to see Mother. During a July 6, 2009 meeting with a social worker, Precious was very emotional, refused to return home, and blamed Mother for her bad grades and behavior. Precious reiterated her claim that Stepfather beat her; Precious also said that Stepfather beat Mother and "controls the house." Precious claimed that no one was on her side or believed her.
During a July 14, 2009 psychiatric assessment, Precious stated that she wanted to hurt herself, so she was admitted to a psychiatric hospital on a 72-hour hold. Precious was diagnosed with major depression, but was *1256 released from the hospital on July 17, 2009, without medication being prescribed. On July 20, 2009, a team decision-making meeting was held to determine whether Precious needed a higher level of care or whether she could be returned home with intensive services. As a result of the meeting, a safety plan was created that included family therapy and placement of Precious in a group home where it would be ensured that she received appropriate mental health services.
After Precious was placed in a group home on July 20, 2009, she called the social worker several times, threatening to run away if she was not placed with the maternal grandfather. DCFS did not allow Precious visitation with the maternal grandparents because the issue of their criminal backgrounds first needed to be resolved. In August 2009, Precious was suspended from school because of her disruptive behavior; she asserted that the school staff harassed her for no apparent reason. Precious remained placed in the group home at the time of the jurisdiction and disposition hearing in November 2009.
According to the DCFS service log for July 20, 2009, DCFS decided to bring the family to the attention of the juvenile court because Precious refused to return home and Mother said that she could not care for Precious's special needs. DCFS later wrote in a report that "[d]ue to the child's incorrigible behaviors, it was determined that a petition must be filed on behalf of the child for court ordered services."
On July 31, 2009, DCFS filed a dependency petition as to Precious, but not as to her half sisters, who remained in Mother's custody. The petition contained allegations against Mother under section 300(b) (failure or inability to protect). Allegations against Stepfather under section 300, subdivisions (a) (serious physical harm) and (b) were later dismissed.
In the September 2009 jurisdiction/disposition report, DCFS reported that Precious was cooperative during group therapy sessions, was participating in individual therapy, anger management, and drug and alcohol counseling. She also was prescribed psychotropic medications of Abilify and oxcarbazepine. With respect to visitation, the DCFS report stated, "No visitation orders have been made to date as to the family. DCFS recommends monitored visitation for the mother and child in a therapeutic setting. The mother and child have not had any face to face visits to date as the minor has refused to visit with the mother, however both mother and child report talking on the telephone almost daily."
*1257 In preparation of its report, DCFS interviewed Mother, who told DCFS that Precious had run away from home numerous times; each time, Mother had filed a police report, except for the second time when Mother thought that Precious would come right back. On one occasion, Mother searched Precious's room and found out where she was staying; Mother, Stepfather, and the maternal grandfather went looking for Precious, asking people about her and showing them her picture. On two occasions, Mother sent Precious to live with her maternal aunts, but that did not work out because Precious ran away from the aunts' homes. Mother said that she had "tried everything with Precious." According to Mother, Precious admitted to making up a story about being raped and held hostage. After Precious was placed in foster care, she called Mother several times to ask if she could come home and to apologize for lying. Mother told DCFS that "`I just want Precious to get some help before she comes home. I have always wanted her and I still want her to come home, but she needs help.'"
In its report, DCFS alleged that there were four problems requiring intervention: (1) an ongoing conflict between Precious and Mother such that Mother "is unable to care for the minor due to the minor's extreme behavioral problems"; (2) the unwillingness of Precious to return home; (3) the physical abuse of Precious by "one or more adults in the home"; and (4) the failure of the family to benefit from prior voluntary family maintenance services. Notwithstanding the foregoing alleged problems, DCFS's report admitted that, other than assertions by Precious, there was no other evidence of physical abuse; that juvenile court jurisdiction was sought because of Precious's incorrigible behaviors and her need for court-ordered services; that Mother felt that she was in need of services to help her control Precious's behaviors; that Mother was concerned about her financial ability to provide care for Precious while she was in placement; that the reason why the family therapy called for by the safety plan was never initiated was because Precious refused to see Mother; that Mother expressed a willingness to participate in services to assist reunification; that Precious was not afraid of Mother; that Precious felt safe in Mother's care; and that "[t]here remains open communication between the mother and the child, despite the current circumstances."
At the jurisdiction and disposition hearing on November 24, 2009, the juvenile court admitted into evidence DCFS's detention and jurisdiction/ disposition reports and heard argument of counsel. Mother requested that the court dismiss the petition on the ground that Precious's incorrigible behaviors were an insufficient reason to assert dependency court jurisdiction. The court denied Mother's request and sustained a count under section 300(b) that was *1258 amended to state that Precious "is unwilling to return to the mother's home and has repeatedly gone AWOL. Additionally, [Mother has] been unable to provide ongoing supervision of this child. Said inability of the child's mother endangers the child's physical and emotional health and safety and places the child at risk of harm."
The juvenile court explained its denial of Mother's request to dismiss the petition and its assertion of jurisdiction under section 300(b) as follows: "I think the documents presented by the department are clear that there is a substantial risk that this child is going to suffer physical harm based upon what has been her behavior of running away, being AWOL, being incorrigible, and her mother has the inability to supervise or protect her daughter because the parent, the mother, and the daughter are not communicating. [¶] And the court feels that the department has met [its] burden of showing that this is a child at risk of being abused or neglected, some of which is through her mother's inability to control her and some of which is Precious's behavior of not wanting to comply. [¶] But the result is still the same in that Precious is somebody that comes within the jurisdiction of this court. And so the court is going to sustain [count b-2 of the petition] as amended."
As to disposition, the juvenile court removed Precious from Mother's custody. With respect to family reunification services, Mother's attorney requested that the court order only family therapy when appropriate, and not parenting or individual counseling for Mother. DCFS agreed that a parenting class would not benefit Mother. The court then agreed to follow Mother's request, "since we're all very clear that the issue's Precious, not [Mother]." The court then ordered therapy for Mother and Precious when Precious's therapist deemed it appropriate. For Precious, the court ordered individual counseling, a tutoring referral, and an ILP (independent living skills program) referral. The court ordered that Mother's visits were unmonitored, and the visits were not to include Stepfather. The court also ordered Precious, who attended the hearing, to visit with Mother. The court told Precious, "I need you to be clear that I expect you to work with this court in fixing what is wrong. I don't believe it is all your mother's fault. I believe you are responsible for some of the damage that's been done."
Mother appeals from the jurisdiction and disposition orders, raising challenges to the sufficiency of the evidence.

DISCUSSION
"`When the sufficiency of the evidence to support a finding or order is challenged on appeal, the reviewing court must determine if there is any substantial evidence, that is, evidence which is reasonable, credible, and of *1259 solid value to support the conclusion of the trier of fact. [Citation.] In making this determination, all conflicts [in the evidence and in reasonable inferences from the evidence] are to be resolved in favor of the prevailing party, and issues of fact and credibility are questions for the trier of fact. [Citation.]' "(In re Savannah M. (2005) 131 Cal.App.4th 1387, 1393 [32 Cal.Rptr.3d 526].) While substantial evidence may consist of inferences, such inferences must rest on the evidence; inferences that are the result of speculation or conjecture cannot support a finding. (Ibid.)
(2) "A jurisdictional finding under section 300, subdivision (b) requires: `"(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) `serious physical harm or illness' to the child, or a `substantial risk' of such harm or illness." [Citation.]' [Citations.]" (In re James R. (2009) 176 Cal.App.4th 129, 135 [97 Cal.Rptr.3d 310].)
The juvenile court in this case made only one finding that can be construed as critical of Mother's parenting skills or conduct, and that is the finding that Mother and Precious were not communicating. But this finding is not supported by substantial evidence because the record shows that Mother and Precious were in daily telephone contact. DCFS's jurisdiction/disposition report also noted as a family strength that there was "open communication between the mother and the child, despite the current circumstances."
Nor is there substantial evidence in the record to fault Mother for the failure to initiate family therapy and the failure of the voluntary family reunification plan. It was undisputed that Mother was willing to participate in therapy, but it was Precious who was refusing to see Mother. DCFS did not initiate family therapy because of Precious's conduct, not Mother's. DCFS admitted that it sought dependency court jurisdiction because of Precious's incorrigible behaviors and her need for court-ordered services, not because of any neglectful conduct of Mother. It is also apparent that there was no neglectful conduct by Mother because Mother was not ordered to participate in any services except family counseling with Precious, when Precious's therapist deemed it appropriate. Mother was always ready and willing to participate in family counseling. We thus conclude that there is insufficient evidence of unfitness or neglectful conduct by Mother.[2]
DCFS contends that jurisdiction is proper under section 300(b) if there is an inability on Mother's part to supervise or protect Precious, notwithstanding the lack of any neglectful conduct by Mother. DCFS argues that the *1260 inclusion of the words "willful or negligent failure" in other clauses of section 300(b), but not in the clause at issue here (see fn. 1, ante), 1253 indicates a legislative intent that neither parental unfitness nor neglectful conduct is required to assert jurisdiction.
As DCFS points out in its brief, this is a case of first impression as to whether parental unfitness or neglectful conduct is required for the assertion of jurisdiction based on a parent's "inability ... to adequately supervise or protect the child." As we explain below, we reject DCFS's interpretation of section 300(b) because it would not comport with due process principles and the dependency process viewed as a whole.
(3) "Given the complexity of the statutory scheme governing dependency, a single provision `cannot properly be understood except in the context of the entire dependency process of which it is part.' [Citation.]" (In re Nolan W. (2009) 45 Cal.4th 1217, 1235 [91 Cal.Rptr.3d 140, 203 P.3d 454].)
The nature of the dependency statutory scheme from the parent's perspective was explained as follows in In re Meranda P. (1997) 56 Cal.App.4th 1143 [65 Cal.Rptr.2d 913]: "The dependency scheme is a `remarkable system of checks and balances' [citation] designed to `preserve the parent-child relationship and to reduce the risk of erroneous fact-finding in ... many different ways ....' [Citation.] Until permanency planning, the parent's interest in having a child returned to the parent is the paramount concern of the law. [Citations.] The parent is thus entitled to 12 months, and possibly 6 more months, of reunification services aimed at assisting the parent in overcoming the problems that led to the child's removal. [Citations.] There is also in force at the dispositional hearing and at all subsequent prepermanency planning hearings a statutory presumption that the child will be returned to parental custody. [Citations.] [¶] In addition, there are `precise and demanding substantive and procedural requirements' which the petitioning agency must fulfill before it can propose termination. At the dispositional hearing, the agency must show by the enhanced standard of clear and convincing evidence that removal of the child is necessary. [Citation.] ... Before reunification can be terminated, the agency must establish by a preponderance of evidence that it would be detrimental to return [the] child to the parent. [Citations.]" (Meranda P., at p. 1154.)
(4) Due process guarantees apply to dependency proceedings. (In re A.S. (2009) 180 Cal.App.4th 351, 359 [102 Cal.Rptr.3d 642].) "In deciding requirements of due process, the court evaluates three elements: the private *1261 interests at stake, the government's interest, and the risk the procedures used will lead to an erroneous decision. [Citations.] [¶] The private interest at stake in a dependency proceeding is enormous. A parent's interest in the companionship, care, custody and management of his or her children is a fundamental civil right. [Citation.] Children, too, have a compelling independent interest in belonging to their natural family. [Citation.] In addition, each child has a compelling interest to live free from abuse and neglect in a stable, permanent placement with an emotionally committed caregiver. [Citation.] The governmental interest in a child's welfare is significant. `[T]he welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect.' [Citation.]" (In re Dakota H. (2005) 132 Cal.App.4th 212, 222-223 [33 Cal.Rptr.3d 337].)
"The California dependency system comports with federal due process requirements because `[t]he number and quality of the judicial findings that are necessary preconditions to termination convey very powerfully to the fact finder the subjective certainty about parental unfitness and detriment required before the court may even consider ending the relationship between natural parent and child.' [Citation.]" (In re A.S., supra, 180 Cal.App.4th at p. 359.)
Under DCFS's construction of section 300(b), dependency jurisdiction might be asserted over an incorrigible child whose parent is neither unfit nor neglectful. Such a jurisdictional finding might then be the basis for the child's removal and for an order requiring reunification services that are either unnecessary or doomed to failure due to incorrigible conduct on the child's part, and then for the ultimate termination of parental rights. Thus, parental rights might be terminated and the family unit destroyed without any finding of unfitness or neglectful conduct. Such a result would not comport with federal due process principles.
For all of the foregoing reasons, we conclude that substantial evidence does not support the assertion of dependency court jurisdiction over Precious. "In light of our determination that the jurisdictional order must be reversed, the dispositional order placing the children outside mother's home and all subsequent orders as to mother must be reversed as well." (In re R.M. (2009) 175 Cal.App.4th 986, 991 [96 Cal.Rptr.3d 655].)
Our juvenile court system is not without recourse and resources to deal with an incorrigible minor, notwithstanding the lack of dependency jurisdiction in the circumstances of this case. (See, e.g., §§ 601 et seq. [providing procedure to adjudge a habitually disobedient or truant minor a ward of the court], 241.1 [providing procedure for minor who "appears to come within the description of both Section 300 and Section 601 or 602"].)

*1262 DISPOSITION
The orders of the juvenile court as to Patricia D. are reversed. The court is ordered to dismiss the petition as to Patricia D. and to return Precious D. to the custody of Patricia D. forthwith unless new circumstances would justify a new finding of jurisdiction.
Rothschild, J., and Johnson, J., concurred.
NOTES
[1] Unspecified statutory references are to the Welfare and Institutions Code. Section 300, subdivision (b) (section 300(b)) provides that a child comes within the jurisdiction of the juvenile court if: "The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." (Italics added.) The italicized phrase is at issue on this appeal.
[2] There is no claim in this case that Mother is unfit so we have no occasion to address other bases for dependency jurisdiction, including that part of section 300(b) providing for jurisdiction based on the "inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." (§ 300(b).)