Filed 4/16/14  In re A.D. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.D. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>F.L.,<br><br>    Defendant and Appellant. | E059296<br><br>(Super.Ct.No. SWJ1300129)<br><br>**OPINION** |

APPEAL from the Superior Court of Riverside County.  John M. Monterosso, Judge.  Affirmed.

Donna P. Chirco, under appointment by the Court of Appeal, for Defendant and Appellant.

Pamela J. Walls, County Counsel, and Julie Koons Jarvi, Deputy County Counsel for Plaintiff and Respondent.

1

F.L. (Mother) appeals from the jurisdiction/disposition hearing involving her children, A.D. and M.D., during which the juvenile court found the allegations in the Welfare and Institutions Code section 300 petition[1] true, and ordered that they remain in out-of-home custody.  Mother claims on appeal that (1) substantial evidence did not support the allegations in the section 300 petition; (2) the juvenile court erred by refusing to return A.D. and M.D. to her care during the reunification period; and (3) the visitation order was an improper delegation of authority.

I

PROCEDURAL AND FACTUAL BACKGROUND

A.      *Original Detention*

A report was received by the Department on February 19, 2013, that Mother had been incarcerated on an immigration hold in San Diego.[2]  Mother's boyfriend was no longer willing to take care of her children, A.D. who was 15 years old, and M.D. who was 9 years old.  There were no other family members willing to take care of them.

A.D. and M.D. both reported that there was no physical or sexual abuse occurring in the home but that they no longer wanted to live with Mother's boyfriend.  Their father, Ad.D (Father), could not be located and was reported to live in New York City.  He had

---

**1**      All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

**2**      Mother was born in Senegal.

2

not been a part of the family for several years.[3]  A.D. and M.D. were placed in foster care on February 19, 2013.

Several prior referrals where it was reported that Mother left A.D. and/or M.D. without supervision were unfounded.  Visitation could not be ordered at the time of the filing of the section 300 petition because Mother was incarcerated and Father's whereabouts were unknown.

On February 21, 2013, the Department filed a section 300 petition against Mother and Father alleging that they willfully or negligently failed to provide support and proper supervision to protect the safety of A.D. and M.D.  A detention hearing was held on February 22, 2013.  The juvenile court found a prima facie case and ordered that M.D. and A.D. remain detained and kept in foster care.  Visits with Mother while she remained incarcerated were also ordered.

B.    *Jurisdiction/Disposition Report*

In a jurisdiction/disposition report filed on March 22, 2013, the Department recommended that A.D. and M.D. remain detained and that reunification services be granted to Mother.

A.D. and M.D. both reported they wanted to reunify with Mother.  They were happy to be away from her boyfriend.  A.D. did the majority of cooking and cleaning in the house after Mother was incarcerated.  They reported no physical or sexual abuse

---

[3]    Father has not filed an appeal.

3

while in Mother's care. They felt safe with Mother. A.D. and M.D. were bonded. If they could not be returned to Mother's care, they would like to remain in the foster home.

Mother spoke with a social worker. She had been detained in September 2012 on a deportation warrant and was still incarcerated. She had been advised she would be released on March 25, 2013. She claimed to have work permits to remain in the country but failed to notify the proper authorities when she moved from North Carolina to California. She was in the process of getting a green card.

Mother had married Father in Senegal when she was 15 years old. They moved to New York. Mother was the victim of domestic violence committed by Father. They were divorced. Mother met her second husband in North Carolina. Her second husband was also physically violent with her. He repeatedly raped, punched and slapped her. He threatened her that he would disclose her immigration status if she told anyone. He was verbally abusive with A.D. and M.D.

A.D. was recently enrolled in a new high school and was failing a class. It was reported that M.D. suffered from attention deficit disorder (A.D.D.) but no specific diagnosis existed. Visits had not occurred due to Mother's incarceration.

An addendum report was filed on April 29, 2013. M.D. and A.D. had been returned to Mother's care on April 23, 2013. It was recommended that they remain in Mother's care on a family maintenance plan.

Mother reported she intended to go back to work as a hairdresser and that her brother was helping her financially. Mother advised a social worker that her immigration status was "her business" but she was working with a lawyer and she would soon receive

4

her green card. Mother insisted she could no longer be deported. Mother had several friends who would take care of A.D. and M.D. in the event she was held again. A.D. and M.D. had expressed concern about returning to Mother's care without the family engaging in therapy.

C. *Amended Detention Petition*

On May 1, 2013, an amended section 300 petition was filed. Under b-1 and b-2, it was alleged against Mother and Father that they were not part of the household and failed to provide for A.D. and M.D. The b-3 allegation stated that Mother neglected the well-being of her children in that on April 29, 2013, despite the children being placed with Mother on family maintenance, the children were told by Mother to return to the foster home. Mother did not advise the foster mother or the Department. The b-4 allegation stated that Mother had unresolved anger issues and lacked appropriate parenting skills in that she screams at the children and blames them for her involvement with the Department. A.D. was refusing to return to Mother's care. This placed the children at risk of suffering physical and emotional harm. Finally, there was an allegation under g-2 against Father for no provision of support.

It was recommended that A.D. and M.D. remain detained in a foster home. Mother was to be granted reunification services. Visitation would be supervised and directed by the Department.

According to the detention report, on April 29, 2013, both A.D. and M.D. appeared at their former foster home. A.D. and M.D. reported to the foster mother that Mother had an appointment in San Diego and she did not know when she would be back.

5

Both A.D. and M.D. had been instructed by Mother to go to the foster home. They took the bus to the location. Foster mother did not know they were coming to her house.

A.D. had written a letter to the foster mother advising her that she and Mother had been arguing. A.D. expressed that Mother tried to control her. She also expressed how well the foster mother had treated her. Mother told A.D. that the foster mother did not love her and that she only took care of her because she got paid. A.D. and M.D. had both reported they wanted to stay with the foster mother.

The social worker went to the foster home. A.D. and M.D. were present and appeared happy and comfortable. Foster mother played some telephone messages she received from Mother. They were "contradicting, rude, and in a threatening tone." The social worker believed that Mother tricked one of the children into giving her the foster mother's telephone number. A.D. and M.D. told the foster mother that Mother had severe mood swings, a "nasty" temper and she often screamed at them.

The social worker spoke with A.D. Mother had told A.D. she had to go to an appointment in San Diego and she did not know when she would be back. A.D. wanted Mother to get a job and learn not to yell at her and M.D. Mother did not get enough help when they were returned to her care and she was angrier than before they were removed from the home. When A.D. was told she may not be able to stay in the foster home, she said, "'I'm not going back, I don't want to!'"

M.D. also stated that Mother yelled at him. He said that she yelled about everything, not just when they were in trouble. It made M.D. sad. M.D. wanted to stay in the foster home until Mother could be "happier."

6

M.D. and A.D. were advised that they could stay in the foster home and they were both very excited. The social worker met with Mother to explain that A.D. and M.D. were being detained. Mother immediately became "confrontational, loud and aggressive." Mother claimed that she had arranged for a "man" to pick up A.D. and M.D., and advised the children that if he did not pick them up, to walk to the foster home to use the telephone. Mother could not state who the children were supposed to call and became agitated. The social worker ended the encounter because of Mother's attitude and threats. As the social worker walked away, Mother yelled, "'I'm African, not American, and you don't [know] who you're messing with! You'll see!'"

It was recommended that A.D. and M.D. remain detained so that Mother could work on her parenting skills and anger issues. It was also recommended that the family receive counseling. The juvenile court found a prima facie case as to the amended section 300 petition and ordered that M.D. and A.D. remain detained and kept in foster care. Supervised, weekly visitation was ordered.

D.    *Contested Jurisdiction/Disposition Hearing*

On May 22, 2013, the Department filed an addendum report in anticipation of the contested jurisdiction/disposition hearing. It was recommended that A.D. and M.D. remain in the foster home and detained from Mother and Father. Mother was to be granted reunification services. It was recommended that visitation be supervised by the Department.

Mother claimed that the allegations in the amended section 300 petition were a "lie." Mother insisted a friend was supposed to pick up the children and they were not

7

instructed to go to the foster home. Mother claimed she called the foster home when she found out they had gone there but the foster mother refused to release the children to her friend. Mother was willing to participate in services in order to get A.D. and M.D. back.

On May 20, 2013, A.D. refused to visit with Mother. M.D. attended visitation. Father's whereabouts were unknown.

Another addendum report was filed on July 2, 2013. Mother was participating in counseling and parenting services. A.D. had been provided a prayer rug and prayer outfit (the family was Muslim). A.D. and M.D. had not wanted to attend temple services.

A.D. and M.D. did not want to visit with Mother. They reported during past visits that she was inappropriate and questioned them about the most recent detention. M.D. was being told not to listen to the foster mother. Mother threatened M.D. that if he listened to the foster mother, she would slap him.

At the contested hearing conducted over two days on July 2 and 3, 2013, A.D., M.D. and Mother testified, as will be provided in further detail, *post*. The juvenile court found the allegations under b-2, b-4 and g-2 in the amended section 300 petition true. Mother was granted six months of reunification services. The court ordered that if therapy was effective, Mother would be granted unsupervised and overnight visits. The supervised visitation order remained unchanged. M.D. and A.D. continued in their out-of-home placement.

## II

## JURISDICTIONAL FINDINGS

Mother contends on appeal that there was insufficient evidence of past or future harm to A.D. and M.D. to support the allegations in the section 300 petition.

### A. *Additional Factual Background*

Mother called A.D. to testify at the contested jurisdiction/disposition hearing. In 2010, Mother went to North Carolina and left A.D. and M.D. with a friend. The friend forgot to pick up M.D. from the bus and the Department was called. A.D. admitted at that time she was asked by the Department if she had been abused by Mother. A.D. said she lied and told the social worker that she was not abused by Mother. She lied because she was afraid of getting in trouble with Mother.

A.D. also stated that a social worker came to her school another time when Mother was getting divorced from her second husband. The social worker asked A.D. if she was being abused by Mother. She lied and said that she was not being abused. At that time, the truth was that Mother was verbally abusive to her. She also would hit A.D. with her hands when A.D. used profanity. She also had pushed A.D. Other times, Mother hit A.D. when A.D. did not do her chores.

A.D. lied when she was initially detained in this case and said that Mother was not abusing her. At that time, she was afraid of foster care.

A.D. was raised as a Muslim and her Mother would not let her date. Mother did not feel comfortable when A.D. was with other non-Muslim children. A.D. wanted to maintain her Muslim faith. A.D. kept up her Muslim faith in foster care by fasting,

9

reading the Koran and praying. She was teaching M.D. about the Muslim faith. She claimed she was not doing well in school because of all that had happened.

Once A.D. was out of her Mother's care, she finally realized that her Mother was inappropriate by both verbally and physically abusing her. A.D. also claimed that Mother had pulled her hair and hit her on her back. Mother had called her fat. A.D. had lied because she was afraid Mother would hit her or send her back to Senegal.

A.D. did not like visits with Mother because she would ask inappropriate questions about the dependency proceeding. Mother was angry that A.D. reported Mother. Mother told A.D. not to listen to the foster mother. A.D. loved Mother and wanted to return to her care if she went to therapy for her anger. She was willing to work with Mother.

M.D. testified. M.D. also lied when he was first detained that he had not been abused by Mother. Mother had hit him "hard" with her hand on his arm and back. M.D. had observed Mother hitting A.D. M.D. loved Mother but did not want to return to her care because she said mean things to him. Mother told him during a visit not to be nice to the foster mother. M.D. did not want to visit with Mother. He would agree to visit with Mother if she agreed not to yell at him and if the visits were supervised.

Mother testified. Mother had only left the children one time to go to North Carolina for medical treatment for her Lupus. She always provided someone to care for them, including when she was held on the immigration issue. She worked as a hair dresser from her home.

Mother had arranged for A.D. and M.D. to take a taxi home on the day she had an appointment in San Diego. The taxi driver reported to Mother that he could not find A.D. Mother claimed A.D. and M.D. ran away to the foster home. Mother denied that she yelled at A.D. and claimed she had no chores to do at the house. A.D. did not respect Mother's rules. Mother had never hit A.D. Mother claimed she had to yell at M.D. sometimes because of his A.D.D. and the unsafe things he did. Mother denied she yelled at or was rude to a social worker. A.D. always did well in school when with Mother.

Mother believed that A.D. was lying about the abuse so she could get her way. Mother claimed no one was willing to listen to her. A.D. had changed since she was placed in the foster home. She was disrespectful and talking back to Mother. M.D. had complained that Mother did not have the videogames that the foster mother had in her home. Mother wanted A.D. to change back to the child she had raised. Mother was willing to do anything to get her children back.

Mother insisted she had nothing to do with the children being detained. She had never hurt, yelled at or done anything wrong to A.D. and M.D. A.D. and M.D. were lying. Mother denied she had any behavior issues that needed to be fixed; A.D. needed therapy. However, she would make any changes she had to make to get the children back. Mother claimed she had received a green card.

The juvenile court noted it had read the reports and considered the testimony. The juvenile court found the allegations under b-2 and g-2 true. As for b-3 and b-4, the court noted that A.D. and M.D. loved Mother and Mother loved them. Mother had done a "pretty good job" of raising the children. However, when Mother was placed on an

11

immigration hold, the children realized, once they were placed outside the home, that Mother engaged in inappropriate behavior. This included corporal punishment and demeaning language. The juvenile court believed A.D.'s testimony. Mother was unable to recognize that she acted this way. The juvenile court believed that A.D. and M.D. took advantage of Mother leaving for an appointment and went to the foster home; the juvenile court found the b-3 allegation not true.

The juvenile court found the b-4 allegation true because Mother lacked appropriate parenting skills. The juvenile court admonished Mother that she had to realize that she needed to improve and make changes. Reunification services, including therapy, were ordered. The juvenile court noted, "I think this is a relatively simple case in order to get the kids back to mom. It just requires a little bit of effort and open mind."

As to visitation, the juvenile court ordered, "I am going to issue authorizations upon progress. Then the Department has the authority to provide mother and both kids with unsupervised visits, overnight and weekend visitation, as well as return on family maintenance."

### B.    Analysis

"At the jurisdictional hearing, the court determines whether the minor falls within any of the categories specified in section 300. [Citation.] '"The petitioner in a dependency proceeding must prove by a preponderance of the evidence that the child . . . comes under the juvenile court's jurisdiction."' [Citation.] (*In re Veronica G.* (2007) 157 Cal.App.4th 179, 185.)

"A jurisdictional finding under section 300, subdivision (b) requires: "'(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the child, or a 'substantial risk' of such harm or illness." [Citation.]' [Citations.] The third element 'effectively requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future (e.g., evidence showing a substantial risk that past physical harm will reoccur).' [Citation.]" (*In re James R.* (2009) 176 Cal.App.4th 129, 135.) Issues of fact and credibility are questions for the juvenile court. (*In re Precious D.* (2010) 189 Cal.App.4th 1251, 1258-1259.)

"On appeal from an order making jurisdictional findings, we must uphold the court's findings unless, after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support the findings. [Citation.] Substantial evidence is evidence that is reasonable, credible, and of solid value. [Citation.]" (*In re Veronica G., supra,* 157 Cal.App.4th at p. 185.)

Here, the jurisdictional finding under b-4 – that Mother had unresolved anger issues and lacked appropriate parenting skills – was supported by substantial evidence. The juvenile court believed A.D.'s testimony that she had been physically abused. A.D. testified that Mother had pulled her hair and hit her with her hand on her back. She had also pushed A.D. M.D. also testified that he had been hit "hard" by Mother. Physically abusing A.D. and M.D. showed a substantial risk of harm and lack of appropriate parenting skills.

13

Mother also clearly had unresolved anger problems that could result in harm to A.D. and M.D. Mother had left rude and threatening messages on the foster mother's telephone. A.D. and M.D. reported to the foster mother that Mother had severe mood swings and a bad temper. Mother had been rude and confrontational with the social worker. She threatened the social worker, telling her she did not know who she was "'messing with.'" Mother's volatility certainly could present a substantial risk of harm to both A.D. and M.D.

Finally, Mother completely failed to acknowledge that she had contributed in any way to the family coming to the attention of the Department. Mother blamed A.D. and felt that A.D. needed to change. Although Mother certainly did not have to admit to the allegations made by A.D. and M.D., she demonstrated a lack of insight into her having anything to do with the family being part of the dependency proceeding. The juvenile court could reasonably conclude based on all of the testimony that Mother's lack of insight could result in her physically abusing A.D. and M.D. in the future. As such, the jurisdiction finding by the juvenile court under b-4 was supported by substantial evidence.

This was not a situation as described by Mother of just a rebellious teenager who wanted more freedom. Mother had unresolved anger issues and lacked appropriate parenting skills.

"When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for

jurisdiction that are enumerated in the petition is supported by substantial evidence.  In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.  [Citations.]" (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)  Here, the evidence supported the b-4 allegation and no further discussion of the other allegations in the petition is necessary.

III

DISPOSITIONAL FINDING

Mother contends that the juvenile court erred by maintaining placement of A.D. and M.D. with the foster mother and refusing to return them to her care.

"After the juvenile court finds a child to be within its jurisdiction, the court must conduct a dispositional hearing.  [Citation.]  At the dispositional hearing, the court must decide where the child will live while under the court's supervision." (*In re N.M.* (2011) 197 Cal.App.4th 159, 169.)  "A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent.  [Citation.]  'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate.  The focus of the statute is on averting harm to the child.'  [Citation.]  The court may consider a parent's past conduct as well as present circumstances." (*Id.* at pp. 169-170.)

"Before the court issues a removal order, it must find the child's welfare requires removal because of a substantial danger, or risk of danger, to the child's physical health if he or she is returned home, and there are no reasonable alternatives to protect the child.

15

[Citations.] There must be clear and convincing evidence that removal is the only way to protect the child." (*In re N.M., supra,* 197 Cal.App.4th at p. 170.)

We apply the substantial evidence rule to review the court's factual determination regarding disposition. "'. . . [O]n appeal from a judgment required to be based upon clear and convincing evidence, "the clear and convincing test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong." [Citation.]' [Citation.] 'We have no power to judge the effect or value of the evidence, to weigh the evidence [or] to consider the credibility of witnesses . . . .'" (*In re Mark L.* (2001) 94 Cal.App.4th 573, 580-581, fn. omitted.)

The record in the instant case amply supports the juvenile court's finding that the physical health of A.D. and M.D. was subject to a substantial risk of danger if they remained in the care and custody of Mother. As stated, *ante*, Mother had previously physically abused both A.D. and M.D. Further, she had unresolved anger problems. This presented a risk to the children should she be unable to control her temper. In fact, A.D. and M.D. did not want to return to her custody unless she resolved these problems. Additionally, based on all of the evidence, Mother clearly left A.D. and M.D. in the custody of others who could not adequately care for them. The juvenile court could consider that returning A.D. and M.D. to Mother's custody, without first having her complete counseling in order to resolve these issues, presented a substantial risk of harm to A.D. and M.D., and no reasonable alternative to their removal from her care existed.

Further, as noted above, Mother denied any complicity in the dependency proceedings. Her lack of insight presented a substantial risk of danger to A.D. and M.D. Substantial evidence was presented to support the dispositional order.

## IV

## VISITATION

Mother's third claim is incomprehensible. Although she stated in her brief that she is raising the issue that the juvenile court's visitation order was an improper delegation of authority, she provides absolutely no coherent argument to support the claim. She complains that A.D. and M.D. were allowed to refuse visitation and that "there is no reason to believe after trial visitation with mother is going to magically begin" and that it makes reunification impossible. She provides no citation to the improper visitation order. She provides no further clarification in her reply brief.

The juvenile court order shows that the prior, supervised visitation was to be continued. It further authorized the Department to provide unsupervised visits and overnight visitation if there was progress in therapy. An order setting the terms of visitation in a dependency proceeding is reviewed under the abuse of discretion standard. (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356.) We cannot conclude this was an abuse of discretion. Further, if A.D. and M.D. refuse to attend visitation, the juvenile court is in no position to force them to attend. We reject Mother's claim.

17

V

DISPOSITION

The juvenile court orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI
Acting P. J.

We concur:

MILLER
J.

CODRINGTON
J.