Filed 5/4/17

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re PRISCILLA A., a Person Coming Under the Juvenile Court Law. | B276745 (Los Angeles County Super. Ct. No. DK15337) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JUAN A., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Julie Fox Blackshaw, Judge.  Reversed.

Linda J. Vogel, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, R. Keith Davis, Assistant County Counsel, and Stephen D. Watson, Deputy County Counsel, for Plaintiff and Respondent.

_____

In this juvenile dependency case, defendant and appellant Juan A. (Father) challenges the juvenile court's jurisdiction and disposition orders. In particular, Father argues the juvenile court erred in exercising dependency jurisdiction over his daughter Priscilla A. (Daughter) because she was not at substantial risk of serious physical harm and, even if she had been, Father neither did nor failed to do anything to cause that risk of harm. Because Daughter was not abused, neglected, or exploited and Father neither did nor failed to do anything to put Daughter at any risk of harm, we conclude dependency jurisdiction was not proper here.

## BACKGROUND

1. **Prepetition Events**

    a. **Daughter's Difficult Transition from El Salvador**

Daughter arrived in the United States from El Salvador in April 2014, when she was 11½ years old. She came to the United States to live with Father, who wanted Daughter to have better opportunities than those available in her birth country. Upon arrival in the United States, immigration services detained Daughter for two months. She arrived at Father's home in Los Angeles in June 2014.

2

Daughter moved in with Father and his family, which included his wife (Stepmother) and four other children, ages one, two, 12 and 17.  This was a difficult transition for Daughter.  She had a tough time getting along with her new family, especially Stepmother.  Daughter did not like doing chores or following the family rules.  Daughter often tested and broke the rules and was disrespectful.  She did not want to dress modestly.  She did not communicate comfortably with Father, did not want to eat with the family (despite being asked to do so), did not want Stepmother to drive her to school (despite being offered), and did not tend to her personal hygiene.

Nonetheless, Daughter reported feeling safe in Father's home.  She knew Father would listen to her if she decided to talk to him.  She said, " 'I don't want to [talk to him] but I know he will listen.' "  Daughter denied any type of abuse at home.

Almost everyone interviewed by the Los Angeles County Department of Children and Family Services (Department), including Daughter herself, indicated that Daughter lied a lot.  In fact, the reason the Department filed a petition in this case was based on a story that Daughter later recanted (discussed below).  In addition, Daughter told her mother that Father hit her, but later said he never did.  She said her brother raped and sexually assaulted her in El Salvador, but later admitted that was not true.  She also said she wanted to return to El Salvador, but later said she wanted to stay in the United States and live with her maternal uncle in Texas.  It is difficult to tell whether or when Daughter told the truth.

Father never abused Daughter or any of the other children.  Father gave Daughter an allowance and stated he " 'would talk to [Daughter] for hours and try to explain to her right from wrong.

I never hit her but I would take things she liked like her computer, TV.' " At one point, in light of Daughter's troubling behavior and at her insistence, Father investigated whether and how Daughter could return legally to her mother in El Salvador. He stated he wanted Daughter either to stay with him or to return to her mother in El Salvador because they are her parents and are responsible for her care. Father believed his problems with Daughter began when he told Daughter her clothes were not appropriate for her age. " 'She doesn't like to be told what to do. She doesn't like to be told to dress modestly.' " Father acknowledged Daughter had behavior problems and that it would take time to build a relationship with her.

Stepmother never abused her children or Daughter, although she slapped Daughter's face once when Daughter was arguing with her. There were no injuries or marks as a result of that slap. Stepmother reiterated many of the things Father had reported, including that Daughter was disrespectful, did not like the family rules, and did not like being told to dress modestly. Stepmother said she had Daughter's best interests in mind and was concerned for Daughter's safety. Daughter would leave the house early and return late from school. Stepmother stated she tried to explain many things to Daughter when she first arrived in the United States, but Daughter refused to listen. Stepmother acknowledged the difficulties of not being Daughter's biological mother. Stepmother expressed surprise at many of the things Daughter would say and, eventually, Stepmother stopped trying to discipline her. According to Stepmother, Daughter said she hated Stepmother because she had married Father. Stepmother also indicated she believed at times Daughter acted out on purpose because she wanted to be sent back to El Salvador.

Stepmother explained she and Father had investigated whether and how Daughter could return legally to El Salvador.

### b.    October 2015 Referral

On Monday, October 26, 2015, the Department received a referral alleging Daughter was at risk of abuse from Stepmother and Father.  The referring party reported then 13-year-old Daughter was late to school that morning because she had to walk to school and almost passed out from hunger when she arrived.  According to the referral, Daughter said she had not eaten since Saturday, Stepmother would cook for everyone in the home except for Daughter, and Stepmother would drive the other children to school but made Daughter walk to school.  Daughter also said Stepmother hit her on the mouth with a wooden spoon and "busted" her lip.  But Daughter indicated the incident had happened a week earlier so her lip injury had healed.  Daughter said Father was aware of everything but refused to protect her.  The referring party reported Daughter appeared depressed and cried all the time because of the way Stepmother treated her.

As a result of the October 2015 referral, a Department social worker interviewed Daughter, Father, Stepmother, and other family members.  Daughter admitted she had lied about not being fed and being forced to walk to school.  She also admitted she lied about Stepmother hitting her in the mouth with a wooden spoon.  Instead, both Daughter and Stepmother explained they had been arguing when Stepmother slapped Daughter in the face with her hand and there had been no injury.  That was the only time Stepmother hit Daughter.  There was no evidence of any type of abuse by anyone.  The Department referred Daughter to therapy services and the family to in-home

counseling.  The Department did not immediately file a petition on Daughter's behalf.

    **c.**    **First Involuntary Hospitalization**
           **December 20, 2015, to January 4, 2016**

Almost two months after the October 2015 referral, on December 20, 2015, Daughter was involuntarily hospitalized as a result of threats she made to her own safety.  Daughter told a Department social worker she was home alone when she "couldn't take it anymore" so she took a knife and left.  She went to a neighbor's house and asked for help.  Daughter told the neighbor she wanted to kill herself, although at some point she threw the knife away and never did hurt herself.  The neighbor took Daughter to a police station.  At the same time, Father was at the police station filing a missing persons report because he could not locate Daughter.  Daughter was taken to a hospital because she had threatened to hurt herself.

At the hospital, Daughter reported feeling depressed and suicidal.  She said she had thoughts of suicide for the past 18 months and thoughts of stabbing herself with a knife.  Daughter stated she felt Stepmother overly disciplined her and there was tension between them.  Daughter also reported having nightmares and episodic flashbacks about sexual trauma as well as feeling antagonistic toward her 12-year-old stepsister.  She also reported she was raped and sexually abused by both her brother and her stepfather in El Salvador when she was nine and 10 years old.

Daughter was diagnosed with major depressive disorder, attention deficit/hyperactivity disorder, posttraumatic stress disorder, insomnia, and problems related to parent-child relationships, education, and social environment.  On January 4,

2016, she was discharged from the hospital and released to Father, who consented to starting Daughter on medication.

### d. Second Involuntary Hospitalization January 6 to January 25, 2016

On January 5, 2016, the day after Daughter was discharged from the hospital, Father called the police because Daughter was missing again. Daughter told a Department social worker that she left home that afternoon because Stepmother had been mean to her, called her names, and laughed at her. Father reported that Daughter had climbed out her window. Daughter went back to the same neighbor's house, where she remained outside for some time. It is unclear whether Father or the police picked up Daughter from the neighbor's home, but eventually, in the early morning hours of January 6, 2016, she was readmitted to the hospital because she threatened to hurt herself.

At the hospital, Daughter stated she felt depressed and indicated she "could not take it anymore" and would rather end her life than have Stepmother argue with her and yell at her. She reported that when she returned home from the hospital the day before, Stepmother was angry, yelled at her, and accused her of lying. Daughter said Stepmother would never like her, made her feel unwelcome, and they would never get along. She said living with Father made her want " 'to take a knife and cut her wrists.' " She again reported being raped and sexually assaulted by both her brother and her stepfather in El Salvador. Both Father and Stepmother stated they wanted to help Daughter and have her return home. Father did not believe Daughter would hurt herself, but believed she made those threats in order to get out of the house. Father did not agree to voluntary removal of

Daughter, but wanted to work with her and start therapy services.

Because Daughter threatened to harm herself if returned to Father and Stepmother, the hospital would not release her to Father. The Department obtained a removal order from the juvenile court and the hospital discharged Daughter to Department custody. Daughter received the same diagnosis as she had upon her last hospital discharge, with the addition of housing, economic, and "other psychosocial and environmental" problems. She was prescribed medication and placed with a foster parent.

## 2.    January 28, 2016:  Petition and Detention Hearing

On January 28, 2016, the Department filed a single-count Welfare and Institutions Code section 300 petition on behalf of Daughter.[1]  The petition alleged Father was unable to provide appropriate care and supervision for Daughter because Daughter refused to return to his home and care. In its detention report, the Department concluded the risk to Daughter of future abuse under Father's care was " 'High.' "  As support for its conclusion, the Department pointed to Father's conduct, "which includes, but is not limited to, general neglect as evidenced by the fact that [Daughter] reported Step-Mother does not make her feel welcomed at her home and father does not protect her."  The Department also referred to Daughter's threats to harm herself if forced to return home as well as her dislike of Stepmother. The Department explained Father was willing to have services at home, but the Department was unable to begin services because,

---

[1] Subsequent statutory references are to the Welfare and Institutions Code.

one day after being discharged from the hospital, Daughter was rehospitalized and then placed in foster care. The Department reported Daughter was happy and stable in her foster home.

At the detention hearing held the same day, counsel for Father argued the juvenile court should return Daughter to Father's care. Counsel indicated Father wanted to work together with Daughter and was willing to have services in place at home. The juvenile court refused to release Daughter and instead ordered her detained from Father, with monitored visits and conjoint counseling when appropriate. The court also ordered no contact between Daughter and Stepmother.

### 3.   April 7, 2016:  Jurisdiction Hearing

The jurisdiction hearing was scheduled for March 29, 2016. However, because the Department had not properly served the mother in El Salvador, the juvenile court continued the hearing to April 7, 2016. Nonetheless, at the brief March 2016 hearing, Daughter's attorney reported that Daughter was taking her prescribed medication and was feeling better. Counsel also reported both Daughter and Father were willing to participate in conjoint therapy. The juvenile court ordered conjoint therapy to begin as soon as possible.

At the April 7, 2016 hearing,[2] counsel for Father argued the juvenile court should dismiss the petition because there was no evidence Father was unable or unwilling to care for Daughter. To the contrary, counsel argued, the evidence demonstrated Father was "perfectly capable and willing to provide care" for Daughter and indeed wanted her in his home and was doing

---

[2] By the time of the April 2016 hearing, the Department still had not properly served the mother. But because the mother was not offending, the juvenile court continued with the hearing.

9

everything he could to care for her. Counsel noted it was Daughter who refused to return to Father's home and care.

At the hearing, counsel for Daughter stated Daughter wanted to "develop," "build," and "mend" her relationship with Father. Counsel acknowledged that would take time. However, counsel stated Daughter possibly wanted to live with her maternal uncle in Texas. According to counsel, Daughter wanted to stay in the United States. Counsel also reported Daughter was happy in her foster home and was having no behavioral problems there.

In a report to the court, the Department stated that in a March 1, 2016 interview, Daughter continued to indicate she did not want to live with Father and would "use a knife to kill [her]self" if forced to return. Daughter believed Stepmother did not want her there, called her names, and made her feel bad. Daughter said she was happy in her foster placement, with no suicidal thoughts while there. Her foster mother reported the prescribed medication helped Daughter's mood.

In a later interview, Daughter told a Department social worker that despite her earlier accusations, her brother had not sexually assaulted her in El Salvador. However, Daughter maintained that, although not rape, her stepfather had sexually assaulted her in El Salvador when she was nine years old, but she never told her mother. She also stated she did not want to live with either Father or her mother, but would consider living with her maternal uncle in Texas.

The juvenile court sustained the petition as amended and found Daughter to be a person described by section 300, subdivision (b). The amended petition stated: Father "is unable to provide appropriate care and supervision for the child due to

10

the child's refusal to return to the father's home and care. The child has repeatedly threatened to harm herself if returned to the home of the father and the child's physical well-being is at risk in the home of father and step-mother . . . . On 12/19/2015 and 01/05/2016, the child was involuntarily hospitalized for threatening to harm herself. Such inability to provide appropriate parental care and supervision of the child by the father endanger[s] the child's physical health and safety and place[s] the child at risk of physical harm, damage, and danger." The juvenile court made no findings with respect to Father's fault or lack of fault.

At the hearing, the juvenile court also considered Father's concern with respect to Daughter's medication. Father was not opposed to the medication, but inquired about obtaining a second opinion. The juvenile court explained that a second opinion is part of the court's procedure for approving medication for minors, and the court had already received a second opinion with respect to Daughter's medication. Father also objected to Daughter's potential placement with her maternal uncle in Texas. Father believed it would not be in Daughter's best interest to live with her maternal uncle because he would let her do as she pleased and not supervise her. The court deferred any decision on placement with the uncle until the next hearing.

4. **May 16, 2016: Disposition Hearing**

On May 16, 2016, the juvenile court held the disposition hearing. Counsel for Daughter indicated Daughter did not want to participate in therapy with Father at that time. However, counsel requested conjoint therapy for Father and Daughter once Daughter's therapist recommended it. In a last minute information for the court, a Department social worker reported

having difficulty contacting Father. The social worker stated she most often communicated with Stepmother, who had told the social worker their family had recently moved. In addition, Father had missed one of his monitored visits with Daughter and had left another visit early. Daughter's foster mother reported that Father appeared upset with Daughter.

At the hearing, the juvenile court ordered Daughter removed from Father's custody and placed with the Department for suitable placement. The court deferred ruling on potential placement with Daughter's maternal uncle in Texas until the Department could further assess the appropriateness of that placement, including an assessment of the uncle's immigration status. The juvenile court also ordered reunification services for Father, including monitored visitation and conjoint therapy when appropriate. Again, the court made no findings with respect to Father's fault or lack of fault.

Father appealed the juvenile court's jurisdiction and disposition orders.

**DISCUSSION**

Father argues there was insufficient evidence to support the juvenile court's jurisdictional finding under section 300, subdivision (b)(1). As discussed below, we agree.

## 1. Standard of Review

We review the juvenile court's jurisdictional finding for substantial evidence. (*In re Jonathan B.* (2015) 235 Cal.App.4th 115, 119.) We will affirm if there is reasonable, credible evidence of solid value to support the court's finding. (*Ibid.*) "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the

12

court's determinations; and we note that issues of fact and credibility are the province of the trial court." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.) "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." (*In re Matthew S.* (1988) 201 Cal.App.3d 315, 321.)

**2.    Applicable Law**

The juvenile court declared dependency jurisdiction over Daughter under section 300, subdivision (b)(1). Under the relevant portion of that subdivision, the juvenile court may declare a child a dependent of the court if that child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child." (§ 300, subd. (b)(1).) Although subdivision (b)(1) provides additional grounds for dependency jurisdiction, when we refer to "subdivision (b)(1)" in this opinion, we are referring only to the portion of the statute quoted here.

In *In re Precious D.* (2010) 189 Cal.App.4th 1251, we held a finding of parental unfitness or neglect is required before the juvenile court may declare jurisdiction over a minor under subdivision (b)(1).[3] There, we rejected the same argument the Department makes here, namely, that a parent's inability to

---

[3] The issue of whether subdivision (b)(1) authorizes dependency jurisdiction without a finding that parental fault or neglect is responsible for the failure or inability to supervise or protect a child is currently pending before our Supreme Court. (*In re R.T.* (2015) 235 Cal.App.4th 795, review granted June 17, 2015, S226416.)

13

supervise or protect a child, regardless of fault, warrants jurisdiction under subdivision (b)(1). (*Precious D.*, at pp. 1259–1260.) We determined the Department's interpretation of subdivision (b)(1) did "not comport with due process principles and the dependency process viewed as a whole." (*Id.* at p. 1260.)

In addition to our reasoning in *In re Precious D.*, *supra*, 189 Cal.App.4th 1251, we emphasize the purpose of the dependency law as stated by the Legislature. As our Supreme Court has often explained, a statute's "intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act." (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735; see also *Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 659 [reiterating that literal construction of a statute " 'should not prevail if it is contrary to the legislative intent apparent in the statute' "].) Here, the stated purpose of dependency law informs and refines the current debate concerning subdivision (b)(1) and further supports our conclusion in *Precious D.*

In section 300.2, the Legislature declared the general purpose of dependency law: "Notwithstanding any other provision of law, the purpose of the provisions of this chapter relating to dependent children is to provide maximum safety and protection for children who are currently being *physically, sexually, or emotionally abused, being neglected, or being exploited*, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm. . . . The focus shall be on the preservation of the family as well as the safety, protection, and physical and emotional well-being of the child." (Italics added.) Courts often have echoed this important goal. "[T]he purpose of juvenile court proceedings is to protect children who have been seriously abused, neglected or abandoned

14

by their parents." (*In re Chantal S.* (1996) 13 Cal.4th 196, 207; see also *In re Isabella F.* (2014) 226 Cal.App.4th 128, 140; *In re Kaylee H.* (2012) 205 Cal.App.4th 92, 103, 109; *In re J.S.* (2011) 196 Cal.App.4th 1069, 1082.)

Additionally, in section 300, which defines the various bases for juvenile court jurisdiction, including subdivision (b)(1) at issue here, the Legislature also declared: "It is the intent of the Legislature that this section not disrupt the family unnecessarily or intrude inappropriately into family life, prohibit the use of reasonable methods of parental discipline, or prescribe a particular method of parenting. Further, this section is not intended to limit the offering of voluntary services to those families in need of assistance but who do not come within the descriptions of this section."

Thus, the Legislature declared its intent to protect a particular group of children—namely, those who have been or are at risk of being physically, sexually, or emotionally abused, neglected, or exploited—to the maximum extent possible, as well as its intent not to disrupt or intrude upon families unnecessarily or prescribe a particular type of parenting. (§§ 300, 300.2.) The Legislature also acknowledged some families who need help and services will not fall within the parameters of the dependency system. (§ 300.) In other words, not every child in need is subject to dependency jurisdiction.

With this legislative intent in mind, and in line with our decision in *In re Precious D.*, we conclude the facts of this case do not warrant dependency jurisdiction.

3. **Risk of Harm**

Father argues the evidence did not support a finding that Daughter suffered or was at substantial risk of suffering serious

physical harm.  It is undisputed that, over the course of these proceedings, Daughter did not suffer physical harm or injury.  If we are to believe Daughter's threats, however, she would hurt herself, including potentially killing herself, if returned to live with Father and Stepmother.  Assuming this to be true, we conclude substantial evidence supports a finding that Daughter was at substantial risk of suffering serious physical harm.  Thus, under this assumption, the first prong of subdivision (b)(1) is met.

### 4.    Parental Fault

Even assuming Daughter was at substantial risk of harm, however, the juvenile court erred in asserting dependency jurisdiction over Daughter.  First, substantial evidence does not support a finding that Father was somehow unfit to parent or neglectful with respect to caring for Daughter.  Indeed, the juvenile court made no finding that Father neglected Daughter or was otherwise unfit.  And the sustained petition turned subdivision (b)(1) on its head by stating Father was "unable to provide appropriate care and supervision for the child *due to the child's refusal* to return to the father's home and care."  (Italics added.)  Subdivision (b)(1) requires a finding of parental misconduct or neglect and cannot be based on the conduct of the child or a family's therapeutic needs.  (See, e.g., *In re Precious D.*, *supra*, 189 Cal.App.4th at p. 1259 [jurisdiction under subdivision (b)(1) must be based on parental neglect and not a teenager's incorrigible behavior].)  Simply put, Daughter's risk of harm was not "as a result of" any failure or inability on Father's part.  (Subd. (b)(1).)  Rather, despite Father's best efforts, Daughter's own behavior and mental health challenges resulted in her risk of harm.

16

Second, and related, Daughter does not fall within any of the categories of children the dependency system seeks to protect. As noted above and declared by the Legislature, dependency law seeks to protect children who have been or are at risk of being abused, neglected, or exploited. (§ 300.2.) Daughter was not abused and there is no evidence that she was at risk of being abused.[4] Similarly, Daughter was neither neglected nor exploited and there is no evidence she was at risk of being neglected or exploited. Although section 300.2 may indicate the Legislature's intent that dependency jurisdiction be broadly construed, that broad protection is intended for those children specified in that section, i.e., abused, neglected or exploited children.

The Department argues, however, Father did in fact neglect Daughter because he did not take Daughter's threats to hurt herself seriously, did not enroll her in services or therapy, and considered sending her back to El Salvador. The Department claims, therefore, the record satisfies the subdivision (b)(1) requirement that the child's risk of harm be "as a result of" the parent's failure or inability to adequately supervise or protect the child. The Department overstates the evidence. Although Father did not believe Daughter would hurt herself, he

---

[4] Although Daughter accused her stepfather of sexually assaulting her years ago in El Salvador, her accusation was never substantiated, and given Daughter's propensity to lie, including her admitted lies that her brother raped and assaulted her in El Salvador, it is difficult to know whether that accusation was true. In any event, even if true, such conduct by her stepfather in El Salvador years before would have no bearing in these proceedings. If anything, it would show Father protected Daughter by moving her away from her stepfather.

17

also agreed to have in-home services for Daughter, agreed to participate in conjoint counseling with her, and consented to her medication. Those services could not begin before Daughter's second hospitalization because she was readmitted one day after her discharge. Father was not ignoring Daughter's needs. In addition, although Father considered sending her back to El Salvador, that was at Daughter's insistence and Father thoughtfully investigated the possibility. Contrary to the Department's position, substantial evidence does not support a finding that Father neglected Daughter.

Rather, the evidence demonstrates Daughter was experiencing true difficulty in settling into not only a new culture but a new family as well. She also was experiencing, among other problems, major depressive disorder, posttraumatic stress disorder, and attention deficit/hyperactivity disorder. It is safe to say Daughter needed help and, while even Daughter admits Father was there for her, she refused to ask for or accept his help.

Daughter's unfortunate set of circumstances was not a result of Father's parental unfitness or neglect. Indeed, Father appears to have been a loving, strong, and able parent throughout Daughter's challenging behavior. He tried to help Daughter assimilate and acted in her best interests. He encouraged her to come to the United States so she could have better opportunities. He filed police reports when she was missing. He investigated whether Daughter, at her insistence, could return to her mother in El Salvador. He agreed to counseling. He consented to her medication and also sought a second opinion to be sure it was appropriate. And he voiced concerns about the propriety of her living with her maternal uncle.

On this record, we conclude substantial evidence does not support the juvenile court's jurisdiction order. Because we reverse the juvenile court's jurisdiction order, the disposition order placing Daughter outside Father's home must also be reversed. (*In re R.M.* (2009) 175 Cal.App.4th 986, 991.)

## DISPOSITION

The juvenile court's jurisdiction and disposition orders are reversed.

CERTIFIED FOR PUBLICATION.


                                          LUI, J.

We concur:


ROTHSCHILD, P. J.


JOHNSON, J.


19