Filed 7/24/14  In re A.A. CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re A.A. et al., Persons Coming Under the Juvenile Court Law. | B249629 (Los Angeles County Super. Ct. No. CK92248) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Appellant,<br><br>        v.<br><br>KRYSTAL G.,<br><br>        Defendant and Appellant. | |

        APPEAL from orders of the Superior Court of Los Angeles County.  Valerie Skeba, Referee.  Affirmed in part and reversed in part.

        Judy Weissberg-Ortiz, under appointment by the Court of Appeal, for Defendant and Appellant.

        John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Appellant.

_____

In this dependency case (Welf. & Inst. Code, § 300 et seq.),[1] Krystal G. (Mother) appeals from the juvenile court's jurisdictional and dispositional orders, made after the court sustained allegations in a section 342 subsequent petition involving Mother's seven-year-old and one-year-old daughters. Mother contends there is insufficient evidence supporting the jurisdictional findings under section 300, subdivisions (a) and (b), that her violent altercations with Francisco S., the father of her youngest daughter, endangered the children and placed them at risk of harm. We agree with Mother and reverse these jurisdictional findings (counts a-1 & b-1).

The Los Angeles County Department of Children and Family Services (DCFS) also appeals, challenging the juvenile court's dismissal of the only other count in the section 342 subsequent petition, which alleged that Mother and Francisco's failure to participate in court-ordered services (parenting and therapeutic counseling for Mother's oldest daughter) endangered the children and placed them at risk of harm (count b-2). We disagree with DCFS and affirm the juvenile court's dismissal of this allegation.

Because the evidence does not support a basis for jurisdiction on the section 342 petition, we also reverse the juvenile court's dispositional order arising from the section 342 petition.

## BACKGROUND

The juvenile court originally assumed jurisdiction over minors A.A. and A.S. on October 18, 2012, when A.A. was six years old and A.S. was nine months old. The court sustained allegations in a non-detain section 300 petition regarding Francisco's physical abuse of A.A. (counts b-1 & j-1), Mother's failure to provide mental health treatment for A.A. (counts b-2 & j-2),[2] and Mother allowing A.A. to frequent the maternal

---

[1] Further statutory references are to the Welfare and Institutions Code.

[2] An April 2012 referral to DCFS, alleged that A.A. was exhibiting inappropriate sexual behavior due to having been molested by her maternal grandfather when she was three or four years old and that A.A. had tried to smother her three-month-old sister. There were no prior juvenile court dependency proceedings involving A.A., but DCFS had received six other referrals regarding A.A. prior to the April 2012 referral. DCFS

2

grandparents' home, knowing the maternal grandparents engaged in physical altercations in A.A.'s presence (counts b-3 & j-3).[3] The same day, the court ordered Mother and Francisco to complete a parenting education course and ordered Mother to enroll A.A. in individual counseling. The court did not order any services for A.A.'s Father, C.A., because his whereabouts were unknown at that time. The court placed A.A. with Mother and placed A.S. with Mother and Francisco. The October 18, 2012 jurisdictional/dispositional orders, are not at issue on appeal.

**Detention**[4]

On February 22, 2013, DCFS received the referral which preceded the filing of the section 342 subsequent petition at issue on appeal. The referral to the child abuse hotline stated: "A[.A.] has a bruise on her lower back area. Minor stated her 1 year old baby sister A[.] bit her on the back causing the bruise. Reporting Party stated the explanation about the bruise was not consistent with the injury. The bruise is not a bite mark, but more of a hit type of bruise with some type of object. Reporting party stated minor seems to be protecting someone by not telling what really happened." (Italics omitted.) After receiving the referral, a DCFS social worker visited the family's home on February 22, 2012, and observed the injury on A.A.'s back. The social worker noticed a mark left by "the lower teeth of the biter." A.A. explained to the social worker that her one-year-old sister had bitten her after A.A. took back the juice drink her younger sister had snatched away. The social worker did not observe any other marks or bruises on A.A.'s body, other than a birthmark on her leg.

---

found an April 2011 allegation, regarding sexual abuse of A.A. by her maternal grandfather to be inconclusive.

[3] In October 2007, when A.A. was one and one-half years old, the juvenile court assumed jurisdiction over Mother (then 17 years old) based on allegations of domestic violence between Mother's parents (A.A. and A.S.'s maternal grandparents) and inappropriate discipline of Mother and her sister by their father (A.A. and A.S.'s maternal grandfather). The court terminated jurisdiction in that case in October 2008.

[4] The facts in this section are taken from the March 5, 2013 detention report, unless otherwise indicated.

During the February 22, 2013 home visit, the social worker asked A.A. "about if and when her parents argue." In using the term "parents," the social worker was referring to Francisco and Mother. As set forth above, Francisco is A.S.'s father, but not A.A.'s father. At the time of detention on the section 342 subsequent petition, the whereabouts of A.A.'s father, C.A., were still unknown.[5] Mother, Francisco and the two children lived together in one bedroom of an apartment they rented from a woman who resided with her own family in the other rooms of the apartment.[6]

Regarding A.A.'s comments to the social worker about arguments between "her parents," DCFS reported: "A[.A.] stated that her parents will yell loud. A[.A.] stated 'I get scared' when parents argue. A[.A.] stated that she will 'tremble' because she is scared 'every time' they argue. A[.A.] stated that she stays in her room[7] because she is afraid that her parents are going to hit each other. [The social worker] asked if she has ever seen her parents hit each other. A[.A.] stated that she has not seen them hit each other but is afraid that they are going to. A[.A.] stated that once her mother came into her room when she and father were arguing. A[.A.] stated that she was scared and her mother told her not to be scared and that she would be safe."

The social worker also interviewed Mother on February 22, 2013, and inquired about her arguments with Francisco. Mother admitted she and Francisco would "argue and yell," but she denied Francisco had ever physically abused her. The social worker asked Mother "why the police were called to her home on two separate occasions this

---

[5] By the time of the April 29, 2013 jurisdiction hearing, DCFS had located C.A. and he wanted to have custody of A.A.

[6] At the April 29, 2013 jurisdiction hearing, Mother testified that she and Francisco had been dating and living together since A.A. was two years old. During her testimony at the May 2, 2013 continued jurisdiction hearing, A.A. referred to Francisco as her "dad." She stated she could not remember a time when Francisco (her "dad") did not live with her and Mother.

[7] A.A's room was a walk-in closet attached to the bedroom Mother and Francisco rented. A.A.'s bed fit inside the walk-in closet.

4

week." Mother stated someone had called the police after A.S. bit A.A. Mother speculated the person called the police because A.A. was crying loudly due to the bite, and Mother and Francisco began arguing because Mother slapped A.S. on the hand for biting A.A. and Francisco objected to the punishment. According to Mother, Francisco initially did not realize that A.S. "had in fact bitten A[.A.] and broken her skin." The police did not take a report.

Regarding the other incident that week involving the police, Mother told the social worker she and Francisco had argued one morning at about 4:30 a.m. Francisco was planning to leave to find "day work," but Mother wanted him to stay and take A.A. to school so Mother could attend an appointment. The police responded to the apartment and spoke with Mother and Francisco, but left without taking a report.

When the social worker interviewed Francisco on February 22, 2013, his accounts of the incidents that week involving the police were similar to Mother's. He stated someone called the police after hearing A.A. "screaming after she was bitten by" A.S. On the other occasion, someone called the police because he and Mother were arguing about him leaving for work. Francisco "denied hitting mother, or being abusive to her" during these incidents. He acknowledged he and Mother argued in the children's presence and that he had "'a strong voice.'" In describing his arguments with Mother, Francisco stated, "'It is like a bomb. When it explodes. When we argue. It is for things that are small.'" Francisco volunteered that once, "'a long time ago,'" when he and Mother were dating, he pulled her hair. He denied ever hitting Mother.

On February 22, 2013, the social worker also interviewed Eloisa T., Mother and Francisco's landlord. Eloisa claimed the police were called to the apartment two times that week due to domestic violence between Mother and Francisco. Eloisa told the social worker: "'He hits her. The police come and bother us. The neighbors call them. They scream; they don't let us sleep. This week, the police came two times.' . . . 'She's dumb, she doesn't report him. She says, 'You hit me, you hit me.' At night you hear her screaming. The culprit is the mom; she's the one at fault for allowing it to happen.'" Eloisa stated there was an occasion when her son heard Mother and Francisco "fighting"

5

at 2:00 a.m. Eloisa claimed "the fighting is 'often' and the children are always inside the room with them when the fighting is occurring." Eloisa told the social worker she would "often hear[] A[.A.] crying and screaming inside the bedroom, but denied knowing why the child was crying." Eloisa "stated that she wasn't aware of any direct physical abuse to the children."

On February 25, 2013, the social worker who investigated this referral (CSW Grullon) spoke with another DCFS social worker who had been working with the family since August 2012, before DCFS filed the non-detain section 300 petition (CSW Fucich). Fucich asserted that Mother and Francisco were not in compliance with their court-ordered services plan. Neither had enrolled in a parenting class even though Fucich had provided them with "numerous referrals." Fucich also claimed that, on "numerous occasions," Mother and Francisco declined to open the door or answer the phone when A.A.'s therapist arrived at their apartment to conduct a session.

The following day, social worker Grullon spoke with a watch commander from the sheriff's department. The watch commander found a record of officers being called to the apartment where Mother and Francisco lived on February 21, 2013, due to a loud verbal argument in the apartment between Mother and Francisco "as the 'husband was getting ready to go to work.'"[8] According to the watch commander, officers did not take an injury report, the children were not detained, and "no other action was necessary." The watch commander did not find any other "hits" indicating officers had responded to any other disturbance between Mother and Francisco.

Social worker Grullon interviewed the children's maternal aunt, Christina B., on February 28, 2013. Christina stated she had seen bruises on Mother's arms and face while living with Mother and Francisco at the home of the children's maternal grandparents (at a time not specified in the March 5, 2013 detention report). According to Christina, Mother never asserted Francisco had abused her, but Christina "and the rest

---

[8] At the April 29, 2013 jurisdiction hearing, Mother testified that Francisco was her boyfriend.

6

of the family suspected that [Francisco] was being violent all along." Christina also reported, "she often saw [Francisco] yelling at mother, and wanting to control everything that she did." According to social worker Fucich, the children's maternal grandmother had reported seeing bruises on Mother when Mother and Francisco lived at the maternal grandparents' home, but Mother always denied any abuse by Francisco.

On February 28, 2013, DCFS served Mother and Francisco with a removal warrant and placed the children in foster care.

On March 5, 2013, DCFS filed the section 342 subsequent petition, alleging: "The children A[.]A[.] and A[.]S[.]'s mother, Krystal G[.], and the father of the child A[.S.], Francisco [S.], have a history of engaging in violent altercations in the presence of the children. On prior occasions in 2013 and 2012, the mother and the [S.] father engaged in violent and physical verbal altercations, in the presence of the children, including the father striking the mother. On prior occasions, the [S.] father struck the mother. On a prior occasion, the [S.] father pulled the mother's hair. The child A[.A.] is afraid when the mother and the [S.] father engage in verbal altercations. Such violent altercations on the part of the [S.] father and the mother endangers the children's physical health and safety and places the children at risk of physical harm and damage." (Counts a-1 & b-1.) The subsequent petition also alleged: "The children A[.A.] and A[.S.]'s mother, Krystal G[.], and the father of the child A[.S.], Francisco [S.], failed to regularly participate in parenting classes as ordered by the Juvenile Court. The mother failed to regularly take the child A[.A.] to the child's therapeutic counseling appointments. The mother and the [S.] father's violation of the orders of the Juvenile Court and the mother's failure to regularly take the child A[.A.] to the child's therapeutic counseling appointments endangers the children's physical health, safety and well being and places the children at risk of physical harm and damage." (Count b-2.) Also on March 5, 2013, the juvenile court ordered the children detained and placed in foster care.

7

**Jurisdiction/Disposition**[9]

On March 21, 2013, a dependency investigator interviewed Mother and Francisco together at their home. They both denied Francisco ever hit Mother. Francisco provided additional details about the incident during which he pulled Mother's hair. It occurred when he and Mother were dating and Mother lived at the home of the children's maternal grandparents. Francisco visited the home and "'had an incident'" with the maternal grandfather. Mother stepped in between the two men and Francisco "'accidentally pulled her hair.'"

Francisco acknowledged he and Mother were having a "'disagreement'" in the early morning on February 21, 2013, when the police were called to the apartment. He denied he and Mother were yelling on that occasion.

The dependency investigator interviewed A.A. on March 14, 2013. A.A. acknowledged she would hear Mother and Francisco yell at each other, but maintained "'[t]hey would never hit each other.'" A.A. stated she did not recall telling the social worker she would feel scared when she heard Mother and Francisco yell. She explained: "'When I would hear them yell I would feel like nothing because I wouldn't be in the fight.' [¶] 'I always just played in my room; they would be in their room. I'm in my closet room. . . . She (A[.S.]) was in the bed . . . she (A[.S.]) would just stay quiet.'" Later, however, A.A. told the investigator, "'I was afraid they would hit each other, but I never heard my mom cry or nothing.'"

On March 27, 2013, Christina B., the children's maternal aunt told the dependency investigator: "'Honestly, I don't really see them (mother & [Francisco]). . . . We (maternal aunt & mother) had a falling out because of her boyfriend ([Francisco]). Right now, I just know about their past relationship; I don't know about their current relationship. I just know that when they lived with my parents (maternal grandparents)

---

[9] The facts in this section are taken from the April 9, 2013 jurisdiction/disposition report, unless otherwise indicated.

8

my sister would have bruises on her and I would ask her about them and she would say she ran into something, but I don't know.'"

In support of the allegation in the section 342 petition regarding failure to comply with court-ordered services, DCFS attached to the jurisdiction/disposition report a February 21, 2013 letter from A.A.'s therapist stating, in pertinent part: "Follow through and attendance issues have negatively impacted the client's [A.A.] progress. Therapy sessions at home and transportation to and from the home were provided to the family in order for services to be rendered. The transportation department or this writer drove to the client's home for scheduled appointments and no one came to the door on the following dates, 7/5, 7/12, 7/17, 10/02, 1/3 and 1/5. Therapy sessions were cancelled on the following dates: 7/23, 9/18 & 9/20 (chicken pox), 9/25 (court date), 10/30 (mother ill), 12/13 (mother going to the food pantry), and 1/17 (Drs. Appointment)." DCFS also reported that Mother and Francisco had not enrolled in a court-ordered parenting program even though DCFS had provided them with referrals in August 2012, November 2012, February 2013 and March 2013.

During their March 21, 2013 interview with the dependency investigator, Mother and Francisco claimed A.A. only missed therapy appointments when the therapist canceled or came to the apartment at a time different from what had been scheduled. Mother and Francisco stated they had not enrolled in parenting classes because they could not find a program in the referrals from DCFS that would accept them and they did not have transportation or money to pay for the classes. DCFS reported it had provided Mother and Francisco with transportation funds.

On April 11, 2013, Francisco submitted a letter from a family center stating he had enrolled in a 12-week parenting program and had attended two sessions.

On April 29, 2013, Mother testified at the jurisdiction hearing. She denied Francisco ever hit her, but acknowledged he pulled her hair on one occasion before they were living together. Regarding the February 21, 2013 incident when the police came to the apartment, Mother stated she and Francisco were having a "disagreement" that morning, but were not yelling. Mother denied stating during the incident that Francisco

9

had hit her, as her landlord reported to the social worker.  Mother explained Francisco was in the shower and she called out to him, "Did you hear me?  Did you hear me?"  Mother claimed the police arrived at the apartment that morning looking for people named Javier and Christine, not Mother and Francisco.  Two days earlier, on February 19, 2013, the police came to the apartment due to a report of "a child yelling," not because she and Francisco were arguing.  Mother stated neither she nor Francisco had ever been arrested for domestic violence.  Mother denied ever having bruises on her face or body during her relationship with Francisco, as her relatives had reported to DCFS.

Mother also testified about her compliance with court-ordered services.  Mother stated she received referrals for parenting classes in November 2012, and called all of the programs on the three-page list.  Most of the programs were no longer in business or her calls were answered by a business that was different from what was on the list.  None of the places she called was able to help her.  Eventually Mother was able to find and enroll in a parenting program.  At the time of the hearing, she was entering her fifth week of the program.

Regarding A.A.'s therapy sessions, Mother acknowledged A.A. had initially missed some appointments due to Mother's chronic knee pain resulting from an accident.  Since December 2012, before the filing of the section 342 subsequent petition, however, A.A. had consistently attended her therapy sessions except when the therapist canceled or did not arrive at the scheduled appointment time.  In early February 2013, Mother enrolled herself in individual counseling and intended to continue her sessions.  Mother did not complete her testimony before the hearing was adjourned on April 29, 2013.

In a May 2, 2013 last minute information for the court, DCFS discussed an April 29, 2013 telephone call social worker Fucich had with the children's maternal grandmother and maternal aunt Katherine.  Fucich asked them if they had ever seen Francisco hit Mother.  Katherine stated, in 2009, she once saw Francisco push Mother, but Mother did not fall.  Also in 2009, Katherine reportedly "saw Francisco punch mother on the arm."  Katherine told Fucich that the punch did not result in a bruise, but Mother "does not bruise easily."

10

A.A. testified at the continued jurisdiction hearing on May 2, 2013. She was seven years old at the time. Her counsel questioned her first. A.A. recalled an incident when the police came to the apartment because Mother and Francisco were "talking loud." According to A.A., the police "said to not yell loud, because a lot of people are sleeping, and don't do that again." A.A. stated that when Mother and Francisco would talk loudly to one another they did not push each other.

A.A. answered affirmatively when counsel for DCFS asked if she had ever been afraid Francisco might hit Mother. She answered negatively when counsel asked if Mother and Francisco had done something to make her afraid they might hurt one another.

When Mother's counsel questioned A.A., she stated Mother and Francisco often spoke loudly to one another, and it scared her when they did that. She felt safe with Mother and Francisco and did not believe they would hurt her. A.A. answered negatively when Mother's counsel asked if she thought Francisco and Mother were "going to" hurt each other. A.A. had never seen Mother or Francisco hit the other, and she was not aware of either having "hurt" the other.

Mother's testimony resumed at the May 2, 2013 hearing. Mother acknowledged she had received referrals from the social worker in November 2012, February 2013, and March 2013. She attended a three-week class for parents of traumatized children that the social worker recommended. In April 2013, she enrolled in another parenting class. Based on what she learned in that class, she had changed the way she spoke to A.A. during visits. Mother had been participating in individual counseling since before the children were detained. She stated she had been "evaluated," and it was determined that she did not need to take psychotropic medication.

The presentation of evidence did not conclude on May 2, 2013. The juvenile court continued the jurisdiction/disposition hearing to May 6, 2013. Mother's testimony resumed on that date. Mother stated she was not on speaking terms with the children's maternal relatives because they did not believe A.A.'s statements that she had been molested by her maternal grandfather.

11

Francisco also testified at the May 6, 2013 hearing. He denied he and Mother had engaged in physical altercations, but admitted they had engaged in verbal disagreements. At the time of the hearing, Father was enrolled in a parenting class and had participated in six sessions. He stated the delay in his enrollment was due to the inadequate referrals from the social worker. He and Mother could not find a program on the list that they could enroll in. They found their current parenting program through another source, not the social worker or DCFS.

Before making its jurisdictional findings on the section 342 subsequent petition, the juvenile court declined to hear oral argument by the parties, stating it did not believe argument would "be very helpful." The court sustained the allegations in the subsequent petition regarding Mother and Francisco's history of engaging in violent physical altercations (counts a-1 & b-1, quoted above). The court dismissed the allegation in the subsequent petition regarding Mother and Francisco's failure to comply with court-ordered services (count b-2, quoted above), finding that allegation not to be true. The court ordered the children removed from Mother and Francisco and granted reunification services for Mother and Francisco. The court denied DCFS's request for an order requiring Mother to submit to an Evidence Code section 730 psychological evaluation.

## DISCUSSION

### Mother's Appeal

Mother contends there is insufficient evidence supporting the juvenile court's jurisdictional findings under section 300, subdivisions (a) and (b), regarding a history of violent, physical altercations between her and Francisco.

"'"When the sufficiency of the evidence to support a finding or order is challenged on appeal, the reviewing court must determine if there is any substantial evidence, that is, evidence which is reasonable, credible, and of solid value to support the conclusion of the trier of fact. [Citation.] In making this determination, all conflicts [in the evidence and in reasonable inferences from the evidence] are to be resolved in favor of the prevailing party, and issues of fact and credibility are questions for the trier of fact. [Citation.]"' [Citation.] While substantial evidence may consist of inferences, such inferences must

rest on the evidence; inferences that are the result of speculation or conjecture cannot support a finding. [Citation.]" (*In re Precious D.* (2010) 189 Cal.App.4th 1251, 1258-1259.)

Jurisdiction under section 300, subdivision (a), requires proof "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian." (§ 300, subd. (a).) Jurisdiction under section 300, subdivision (b), requires proof "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . ." (§ 300, subd. (b).)

The identical findings in counts a-1 and b-1 state: "The children A[.]A[.] and A[.]S[.]'s mother, Krystal G[.], and the father of the child A[.S.], Francisco [S.], have a history of engaging in violent altercations in the presence of the children. On prior occasions in 2013 and 2012, the mother and the [S.] father engaged in violent and physical verbal altercations, in the presence of the children, including the father striking the mother. On prior occasions, the [S.] father struck the mother. On a prior occasion, the [S.] father pulled the mother's hair. The child A[.A.] is afraid when the mother and the [S.] father engage in verbal altercations. Such violent altercations on the part of the [S.] father and the mother endangers the children's physical health and safety and places the children at risk of physical harm and damage."

The record contains insufficient evidence demonstrating Mother and Francisco engaged in violent altercations causing the children to be at substantial risk of serious physical harm at the time of the April 29-May 6, 2013 jurisdiction hearing. There are no police reports of physical altercations between Mother and Francisco. When the police were called to the apartment on February 21, 2013, officers found evidence of a verbal argument between Mother and Francisco, but no evidence of physical violence. There is no indication anyone living in or near the apartment ever heard sounds of a physical altercation between Mother and Francisco (a slap, a punch, a bump, a cry of pain). The landlord claimed she heard Mother say, "'You hit me, you hit me.'" But there is no

13

evidence indicating Francisco actually hit Mother on that occasion. No one saw any injuries on Mother around the time of the February 2013 referral, which resulted in the filing of the section 342 subsequent petition. That referral concerned a bite mark on A.A.'s back, not domestic violence between Mother and Francisco.

The maternal relatives claimed Mother and Francisco had engaged in violent altercations in the past, but none had information about the current status of Mother and Francisco's relationship. The children's maternal grandmother and maternal aunt Christina asserted they had seen bruises on Mother when Mother and Francisco were living at the home of the maternal grandparents—years before these dependency proceedings were filed. Although the maternal grandmother and maternal aunt Christina lived with Mother and Francisco when the bruises appeared, they conceded they had never seen Mother and Francisco engage in a violent altercation. During an April 29, 2013 telephone call, social worker Fucich asked the maternal grandmother and maternal aunt Katherine if they had ever seen Francisco hit Mother. Katherine stated she once saw Francisco push Mother and once saw Francisco punch Mother on the arm. Both incidents occurred in 2009—years before these dependency proceedings were filed.

Francisco admitted he pulled Mother's hair once when he and Mother were dating. DCFS included this incident in its allegation that the children were at substantial risk of serious physical harm, even though this incident occurred many years before these dependency proceedings were filed.

A.A. stated she was scared Mother and Francisco were going to hit each other when they argued. She always maintained, however, that she had never seen them hit each other. It is understandable A.A. might anticipate a physical altercation during Mother and Francisco's verbal arguments, given that one of the reasons the juvenile court originally assumed jurisdiction in this case is that her maternal grandparents had engaged in physical altercations in her presence. A.A.'s fear, while not to be taken lightly, is not a sufficient showing to sustain a jurisdictional allegation under section 300, subdivision (a) or (b). Serious physical harm to the child or a substantial risk of serious physical harm to

14

the child is necessary.  (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 717-718.)  DCFS did not make that showing here.

We reverse the jurisdictional findings regarding violent altercations between Mother and Francisco (counts a-1 & b-1) for lack of substantial evidence.

**DCFS's Appeal**

DCFS contends the juvenile court erred in dismissing count b-2 based on the court's finding the allegation was not true.  Count b-2 states:  "The children A[.A.] and A[.S.]'s mother, Krystal G[.], and the father of the child A[.S.], Francisco [S.], failed to regularly participate in parenting classes as ordered by the Juvenile Court.  The mother failed to regularly take the child A[.A.] to the child's therapeutic counseling appointments.  The mother and the [S.] father's violation of the orders of the Juvenile Court and the mother's failure to regularly take the child A[.A.] to the child's therapeutic counseling appointments endangers the children's physical health, safety and well being and places the children at risk of physical harm and damage."

Substantial evidence supports the juvenile court's dismissal of this allegation.  At the time of the April 29-May 6, 2013 jurisdiction hearing, Mother and Francisco were enrolled in a parenting program and had completed several sessions.  The uncontradicted evidence demonstrates the delay in their enrollment in parenting was due to the inadequate referrals they received from DCFS.  They eventually found a parenting program to enroll in, not with the help of DCFS, but through another source.

Mother conceded A.A.'s therapy was inconsistent up to December 2012, due to Mother's chronic knee pain resulting from an accident.  The section 342 subsequent petition containing this allegation, however, was filed on March 5, 2013.  Substantial evidence does not demonstrate A.A.'s attendance was inconsistent at that time due to Mother's fault.  More importantly, DCFS cannot show A.A. was at substantial risk of serious physical harm due to any inconsistency in attending her individual therapy appointments.

DCFS also contends the juvenile court erred in declining to order an Evidence Code section 730 psychological evaluation for Mother at the disposition hearing on the

15

section 342 subsequent petition. Because we find no basis for jurisdiction on that petition, we need not address this dispositional claim.

**Current Circumstances**

On October 25, 2013, the juvenile court terminated jurisdiction over A.A. with a family law order awarding sole legal and physical custody of A.A. to her biological father, C.A. On the court's own motion, we take judicial notice of the juvenile court's October 18 and October 25, 2013 minute orders, indicating the termination of jurisdiction as to A.A. Mother did not appeal from the order terminating jurisdiction or the family law order awarding custody of A.A. to C.A.

As to two-year-old A.S., the juvenile court still has jurisdiction based on the allegations in the original section 300 petition. We are not holding that A.S. must be returned to Mother and Francisco's custody based on our reversal of the jurisdictional findings and disposition order on the section 342 petition. Proceedings are ongoing and the juvenile court will continue to evaluate the propriety of A.S.'s placement.

**DISPOSITION**

The May 6, 2013 jurisdictional findings, regarding violent altercations between Mother and Francisco (counts a-1 & b-1) are reversed. The juvenile court's dismissal of the allegation in the section 342 subsequent petition regarding Mother and Francisco's failure to comply with court-ordered services is affirmed. The May 6, 2013 dispositional order, on the section 342 subsequent petition is reversed.

NOT TO BE PUBLISHED.


CHANEY, J.

We concur:


ROTHSCHILD, P. J.


JOHNSON, J.

16