Filed 8/12/14  In re A.M. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re A.M., a Person Coming Under the Juvenile Court Law. | B253191 (Los Angeles County Super. Ct. No. CK63081) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. RICKIE M., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Julie Fox Blackshaw, Judge.  Affirmed.

Kimberly A. Knill, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

_____

Rickie M. (Father) appeals from the juvenile court's December 9, 2013 jurisdictional and dispositional orders adjudging two-month-old A.M. a dependent of the court pursuant to Welfare and Institutions Code section 300, subdivision (b) (failure to protect).[1]  For the first time, Father raises a facial challenge to the section 300 petition but cannot prevail because attacks on the legal sufficiency of a petition cannot be made for the first time on appeal.  Father's further contention that substantial evidence does not support the court's jurisdictional finding also fails because there is substantial evidence that Father failed to protect and neglected A.M., causing a substantial risk of harm to her. We also disagree with Father's contention that there was no substantial evidence in support of the court's order removing A.M. from his custody.  H.R. (Mother) is not a party to the appeal.  We affirm.

## BACKGROUND

### A.  The detention report

In October 2013, the Department of Children and Family Services (DCFS) reported the following in connection with a detention hearing before the juvenile court to determine whether the minor should be removed immediately from the care of Mother and Father.

In October 2013, DCFS received a referral that Mother and Father had sought medical attention for A.M., who was approximately a week old and had been born at home.  Father told medical personnel he had delivered A.M., removed the placenta, cut the umbilical cord, and cleaned A.M. after she was born.  Mother told medical personnel that A.M. was her first baby, which was not true.  Mother also stated she "only had one prenatal appointment because she didn't know she was pregnant" and did not go to the hospital or call 911 when the baby was born because "it was the middle of the night and the baby came really fast," and because she "didn't know what childbirth would feel like."  Mother admitted to using cocaine daily, but stated that "when she found out she was pregnant," she used cocaine only weekly.  She also stated she had last used drugs

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

three to four months prior to delivering A.M., then "corrected" herself to state she had not used drugs since she became pregnant. Mother and Father stated they could not seek medical attention "sooner due to the rain." But the last rainstorm had occurred before A.M.'s birth. Father had an "odd affect" at the hospital, Mother and Father were "socially isolated," and neither Mother nor Father told their family about A.M.'s birth. A hospital social worker believed Mother and Father were lying and they had delayed seeking medical attention for A.M. "in order to allow for any drugs to leave their systems."

Mother had a long history with DCFS. In 2006, when she was 17 and herself a dependent of the juvenile court, she had a child named P.B. with Steven B. The juvenile court terminated Mother's and Steven's parental rights after the court sustained allegations that P.B. had suffered a severe skull fracture during a violent physical assault of Mother by Steven, both Mother and Steven gave false information to medical personnel regarding how P.B. sustained her injuries, and Mother and Steven failed to reunify with P.B. Mother and Steven also had another child named M.B., born in 2008. Mother abandoned M.B. while Mother prostituted herself. The court also terminated Mother's parental rights over N.B., born in 2012, whose father was Edward C. N.B. had been born with a positive toxicology screen for cocaine and amphetamine. DCFS also determined Mother had been arrested "and/or convict[ed] for disorderly conduct/prostitution and child cruelty."

Father also had a history with DCFS. Lisa M., his child with Jessica F., had been born in 2012 with a positive toxicology screen, and her dependency case was ongoing. When Lisa's caseworker was questioned by DCFS in October 2013, she stated that Lisa's mother reported she had seen needle marks on Father's arm "a month ago."

During an interview with Father on October 21, 2013, DCFS observed "circular marks on [F]ather's right forearm above the inside of his elbow" that possibly were needle marks. When DCFS noted that the address given by Father was a "possible drug den," Father stated "that's why he only gets his mail there and doesn't go around anymore."

Mother and Father submitted to an on-demand drug test on October 21, 2013, with negative results. On October 23, 2013, the juvenile court ordered A.M. detained and removed from the care of Mother and Father.

## B. The amended section 300 petition

On November 18, 2013, DCFS filed an amended section 300 petition pursuant to subdivisions (a), (b), and (j), alleging A.M. came within the jurisdiction of the juvenile court. As pertinent to this appeal and as sustained and amended, paragraph b-1 of the petition alleged under section 300, subdivision (b) that Mother and Father failed to obtain medical treatment for A.M. during the birth of A.M., and for seven days thereafter, and lied to medical professionals about their family situation and the circumstances of A.M.'s birth. Paragraph b-4 of the petition alleged under section 300, subdivision (b) that Father had a history of substance abuse, was a current registered controlled substance offender, had a criminal history of drug-related offenses, had an unresolved substance abuse problem, which rendered him incapable of providing regular care and protection for A.M., and had a history of illicit drug use that endangered A.M.'s physical and emotional health and safety and created a detrimental home environment, placing her at risk of physical and emotional harm and damage.

## C. The jurisdictional and dispositional report

On November 18, 2013, in connection with a jurisdictional and dispositional hearing, DCFS reported the following.

Father initially claimed to have "experimented with marijuana when he was in his twenties," but later stated he had been sober for the past six years.

Father had a third daughter, Sasha, who had been born in 2008. Sasha's mother was a "heavy drug user," who gave birth to Sasha while incarcerated and relapsed after being released.

Jessica, the mother of Father's daughter Lisa, was a heroin addict who had used heroin during her entire pregnancy and refused to seek prenatal care. Father told DCFS he could not force Jessica to seek prenatal care and that if he had taken Lisa away from Jessica, she would not have stopped using drugs. He claimed Jessica was sober now and

4

both he and Jessica were in the process of reunifying with Lisa. Father stated he had refused to submit to a drug test at the request of DCFS on August 26, 2013, "'because I had been testing clean'" and he did not want to shorten his visit with Lisa. Father had also refused to roll up his sleeves to expose his arms during the visit with Lisa and subsequently was ordered by the court to "cooperate with on demand toxicology screenings." He had been reported to have fallen asleep and dropped Lisa during a visit, which was "consistent with current use of narcotics."

Father claimed Lisa's maternal grandmother had fabricated allegations that he had used drugs and supplied Jessica with drugs. Father also claimed Jessica fabricated allegations about his drug use because he was "having a child with another woman." DCFS reported Jessica did not know Father was involved with another woman when Jessica made her allegations about Father's drug use.

Father had an extensive criminal history from 1977 to 2011, including convictions for petty theft, burglary, grand theft, tampering with a vehicle, domestic violence, receiving stolen property, robbery, and providing false identification to a peace officer. His drug-related convictions included a 1992 conviction for possession of a hypodermic needle, a 1996 conviction for possession of a controlled substance for sale, a 2004 conviction for being under the influence of a controlled substance, and a 2011 conviction for possession of a controlled substance. Father had been ordered to register as a controlled substance offender twice in 2011.

Father told DCFS he did not know Mother was pregnant until she came to his apartment with A.M.'s head "'sticking out between her . . . legs.'" Later, he acknowledged he had known Mother was pregnant, stating he had been unable to protect A.M. while Mother was pregnant because Mother refused to seek prenatal care and Father "had no way of forcing her to seek prenatal care." He stated he did not call 911 because Mother told him not to call because she had "lost other children to 'the system.'" Father also stated he did not call 911 because he believed the police would allow Mother to leave with A.M. and then he would have no way of protecting A.M. because Mother was good at "keeping herself from being found." He suspected that, when Mother went

5

missing in the past, she was using drugs. Father stated he did not know if Mother was under the influence of drugs when she gave birth to A.M., but that it "could have been a factor as to why [Mother] did not want to go to the hospital." Father said it took "7 days" to convince Mother to take A.M. to the hospital. Father showed DCFS the wood clamp from his toolbox that he had used to cut the umbilical cord after he had disinfected the clamp with alcohol.

## D.  The December 5, 2013 last minute information

DCFS reported in a last minute information to the juvenile court that Father had missed a random drug test on November 27, 2013, even though he had met with a DCFS caseworker that day. Father called DCFS on December 2, 2013, to report that he had missed the drug test because the laboratory was closed when he reached it after attending a medical appointment. Father claimed to have a note from his doctor verifying that he had medical appointments on November 27, 2013, and December 2, 2013.

## E.  The jurisdictional and dispositional hearing

On December 5, 2013, at the jurisdictional hearing, Father testified he had not seen Mother for a month and a half to two months, when she came to his apartment "in the process of having the baby." Father stated he knew she was pregnant but had attempted unsuccessfully to persuade her to get prenatal care. He said Mother "comes in and out" of his life for months at a time and he assumed Mother used drugs during her pregnancy when she occasionally disappeared. Mother told Father not to call 911 because "the baby is coming now." After he delivered the baby, Mother told him that if he called 911, she would leave with A.M. It took him a few days to persuade Mother to take A.M. to the doctor.

Father testified he had last used drugs three years previously and he had completed a three-year drug treatment program. He also stated he attended Narcotics Anonymous programs, a program called "Project Fatherhood," and counseling provided by the Veterans Administration. He stated he had been required to and had drug tested twice for Lisa's case. Father testified he had attempted to drug test on November 27, 2013, by leaving his medical appointment early, but the laboratory was closed by the time he

reached it, because of "the holiday." He identified a note from his doctor that showed he had an appointment on November 27, 2013, which he returned to finish on December 2, 2013. Father also testified he had furnished his apartment with a crib and other baby supplies.

At the continued jurisdictional hearing on December 9, 2013, Mother testified she told Father not to call 911 when A.M. was born or she would leave with A.M. Mother did not want to go to the hospital, but eventually did so at Father's request.

After hearing argument, the juvenile court stated that, while it found many aspects of Father's testimony to be credible and commended him on his commitment to have custody of A.M., the court found Father posed a risk to A.M. because of his delay in seeking medical attention for A.M. in light of his knowledge of Mother's drug use. The court stated it distrusted Father's testimony because of the misrepresentations he made at the hospital and his refusal to drug test "in August." The court sustained the allegations of the petition as amended.

The juvenile court then ordered that A.M. be removed from the custody of Mother and Father and placed under the supervision of DCFS. The court declined to order family reunification services for Mother, but allowed her to have monitored visits. The court ordered family reunification services for Father and ordered him to participate in random or on-demand weekly drug and alcohol testing, individual counseling, and monitored visits three hours a week with DCFS's discretion to liberalize visitation. Father appealed.

## DISCUSSION

### A. Father's attack on the legal sufficiency of a petition cannot be made for the first time on appeal

Father's first argument is his "facial challenge" to paragraph b-1 of the petition, which as amended and sustained under section 300, subdivision (b) alleged Father failed to obtain medical treatment for A.M. during her birth and for seven days thereafter, and lied to medical professionals about the family situation and the circumstances of her birth. "It is well settled that attacks on the legal sufficiency of a petition cannot be made for the first time on appeal." (*In re N.M.* (2011) 197 Cal.App.4th 159, 166.) Father does

7

not argue that he raised this facial challenge to the sufficiency of the petition below and our review of the record indicates that he did not.  Accordingly, Father cannot prevail because attacks on the legal sufficiency of a petition cannot be made for the first time on appeal.

**B.  Substantial evidence supported the juvenile court's jurisdictional findings under section 300, subdivision (b)**

Father contends the evidence was insufficient to support the juvenile court's jurisdictional findings against him in paragraph b-4, as amended and sustained under section 300, subdivision (b).  We disagree.

Section 300, subdivision (b) provides a basis for juvenile court jurisdiction if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child."

"A jurisdictional finding under section 300, subdivision (b) requires: "'(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the child, or a 'substantial risk' of such harm or illness." [Citation.]' [Citations.]  The third element 'effectively requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future (e.g., evidence showing a substantial risk that past physical harm will reoccur).' [Citation.]" (*In re James R.* (2009) 176 Cal.App.4th 129, 135.)  "[T]he use of the disjunctive 'or' demonstrates that a showing of prior abuse and harm is sufficient, standing alone, to establish dependency jurisdiction." (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1435, fn. omitted.)  Thus, jurisdiction may be exercised "either based on a prior incident of harm or a current or future risk." (*Id.* at p. 1435, fn. 5.)

The juvenile court's jurisdictional finding that the minor is a person described in section 300 must be supported by a preponderance of the evidence.  (§ 355; Cal. Rules of Court, rule 5.684(f).)  """When the sufficiency of the evidence to support a finding or order is challenged on appeal, the reviewing court must determine if there is any substantial evidence, that is, evidence which is reasonable, credible, and of solid value to

8

support the conclusion of the trier of fact. [Citation.] In making this determination, all conflicts [in the evidence and in reasonable inferences from the evidence] are to be resolved in favor of the prevailing party, and issues of fact and credibility are questions for the trier of fact. [Citation.]"' [Citation.] While substantial evidence may consist of inferences, such inferences must rest on the evidence; inferences that are the result of speculation or conjecture cannot support a finding. [Citation.]" (*In re Precious D.* (2010) 189 Cal.App.4th 1251, 1258–1259.) "[W]e must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact. [Citation.]" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 53.)

In sustaining amended paragraph b-4 of the petition under section 300, subdivision (b), the juvenile court held the allegations were true that Father had a history of substance abuse, was a current registered controlled substance offender, had a criminal history of drug related offenses, had an unresolved substance abuse problem, which rendered him incapable of providing regular care and protection for A.M., and had a history of illicit drug use that endangered A.M.'s physical and emotional health and safety and created a detrimental home environment, placing her at risk of physical and emotional harm and damage. The court expressly stated it was finding true the petition's allegation of the current use of drugs. In addition, the court found Father had "failed to seek medical care for the child for seven days and lied to medical professionals about their family situation and the circumstances of the birth."

Thus, our inquiry is whether there was substantial evidence to support the court's determination. There is.

The first requirement of section 300, subdivision (b), in pertinent part, is neglectful conduct by the parent demonstrating an inability to adequately supervise or protect the child. We agree with Father that drug use "'*without more*,' does not bring a minor within the jurisdiction of the dependency court." (*In re Destiny S.* (2012) 210 Cal.App.4th 999, 1003.) There also must be substantial evidence linking Father's drug use to his neglectful conduct. (*In re David M.* (2005) 134 Cal.App.4th 822, 830

9

[evidence of risk of harm to minor *resulting from* mother's substance abuse must be shown to establish jurisdiction]; *In re James R.*, *supra*, 176 Cal.App.4th at p. 137 [*causal link* between alcohol abuse and risk of harm to minors required to assert jurisdiction].)

Here, there is ample evidence both of drug use and actual neglect and failure to protect. The juvenile court had substantial evidence on which to base its conclusion that Father's substance abuse was current, or "unresolved." In August 2013, Father failed to drug test or roll up his sleeves on request; Father was reported to have fallen asleep and dropped another daughter during a visit, which was "consistent with current use of narcotics"; in October 2013, DCFS noted circular marks on his arm that looked like needle marks; in November 2013, Father missed a drug test; and Jessica reported she had seen needle marks on Father's arms within months of the jurisdictional hearing.

Past harm or a risk of harm also is predictive of future harm or a risk of future harm. (See *In re J.K.* (2009) 174 Cal.App.4th 1426, 1428–1429.) By a parity of reasoning, the juvenile court could have considered Father's long history of drug use in reaching the conclusion that his drug abuse problem was unresolved. In particular, Father had a substantial criminal history of drug-related offenses, including a 1992 conviction for possession of a hypodermic needle, a 1996 conviction for possession of a controlled substance for sale, a 2004 conviction for being under the influence of a controlled substance, and a 2011 conviction for possession of a controlled substance. Father was a current registered controlled substance offender. This bolstered the juvenile court's conclusions that Father's substance abuse remained unresolved and he was a current user, whose drug abuse was linked to his neglect and failure to protect A.M.

The evidence of this actual neglect and failure to protect also is substantial. Father chose not to call 911 when he helped Mother deliver A.M. even though he suspected Mother was using drugs and knew she had not sought prenatal care. Instead, Father delivered A.M. with a wood clamp from his toolbox. Although he claimed to have sterilized the wood clamp, that method of delivery on top of his knowledge of Mother's drug use and lack of prenatal care should have persuaded him to call 911 or to bring A.M. to the hospital immediately, rather than waiting seven days.

10

The second requirement of section 300, subdivision (b), in pertinent part, is causation of a substantial risk of physical harm to the minor. Father's argument that A.M. was not harmed by his conduct misses the point. The fact A.M. was healthy does not mitigate Father's choice to indulge Mother's need as a drug user to avoid contact with medical personnel at the potential expense of the child's health. Father's choice in doing so could have been viewed by the juvenile court as predictive of his future choices, placing A.M. at substantial risk of serious physical harm the next time Mother decided not to take her to the doctor. (See *In re J.K.*, *supra*, 174 Cal.App.4th at pp. 1428–1429.)

The third requirement of section 300, subdivision (b), in pertinent part, is substantial risk that the child will suffer serious physical harm. This third element is addressed and satisfied by virtue of the same analysis conducted above.

We conclude substantial evidence supported the juvenile court's jurisdictional findings in paragraph b-4 of the petition under section 300, subdivision (b).

## C. Substantial evidence supported the removal of A.M. from Father's custody

Father contends the dispositional orders must be reversed because substantial evidence does not support the removal of A.M. from Father's custody. We disagree.

Section 361, subdivision (c) provides in pertinent part that a dependent child may not be taken from the custody of her parent unless the juvenile court finds by clear and convincing evidence that "(1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." Thus, the burden of proof in the dispositional phase is clear and convincing evidence when the juvenile court awards custody to a nonparent. (*In re Henry V.* (2004) 119 Cal.App.4th 522, 528–529.) On appeal, "'"the substantial evidence test applies to determine the existence of the clear and convincing standard of proof . . . ." [Citations.]'" (*Id.* at p. 529.)

For the same reasons articulated above, we conclude substantial evidence supports the existence of clear and convincing evidence there would be a substantial danger to

11

A.M.'s safety if she were returned to Father and there was no reasonable means to protect her without removing her from Father. Namely, Father endangered A.M. by failing to call 911 or take her for medical care until seven days after her birth even though the use of the wood clamp during delivery raised the specter of infection, he knew Mother had not received prenatal care, and he suspected Mother was on drugs when she was pregnant and when she delivered A.M. Moreover, Father's drug use was current and unresolved.

## DISPOSITION

The December 9, 2013 jurisdictional and dispositional orders are affirmed.

NOT TO BE PUBLISHED.


MILLER, J.*

We concur:


CHANEY, Acting P. J.


JOHNSON, J.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.